HANCOCK *v.* HANCOCK.

4-5612 130 S. W. 2d 1

Opinion delivered June 26, 1939.

*Partlow & Bradley*, for appellant.

*Fred H. Stafford, H. P. Maddox* and *J. G. Waskom*, for appellee.

SMITH, J. The question at issue in this case arose between Pearl Hancock, the mother, and Kate Hancock, the stepmother, of a thirteen-year-old boy, and involves the right to the custody of the child.

A former appeal in this case reversed the decree of the chancellor in refusing to entertain jurisdiction of the cause, for the reason that the probate court had appointed Kate, the stepmother, as the guardian of the child. *Hancock* v. *Hancock,* 197 Ark. 853, 125 S. W. 2d 104.

In reversing that decree, we said: "Our conclusion is that the chancery court erred in dismissing the petition and writ of *habeas corpus* for the want of jurisdiction to try the cause. The defense interposed by appellee that she had been appointed guardian of the child by the probate court was no defense to the action of appellant for the custody of her child if a fit person to have the custody and control thereof. The chancery court should have heard the case on its merits as to whether the mother was a fit person to have the custody and control of her child."

Upon the remand of the cause testimony was heard upon this issue, and, without hearing all the testimony offered showing fitness of Pearl, the mother, to have the custody of her child, the court announced this finding: "It is apparent, from the evidence, that the mother of

the boy is fit and capable to have its care and custody, no doubt about that, in my mind."

Without reviewing the testimony, it may be said that it fully sustains this finding, but, notwithstanding this finding, the court did not award the custody of the child to its mother.

In explanation of this holding the court said: ". . . When she (the mother) should have had the custody of the child, she did not have it, and did not try to obtain custody of it. If what the child says is true, some one has committed a serious wrong—its father or whoever it was—to turn the child's mind against its mother." The judge then referred to certain statements which the boy said his father had made about his mother, and proceeded to say: "But it is very evident for some reason, whether good or bad, that he should not have been told this. . . . It is an unfortunate thing, but it can't be helped. A change would not result in any good to him now. He probably would not remain where he is sent. His mother waited a long time to ask for custody." Counsel for the mother interrupted to say: "Just three years, Your Honor," to which remark the judge replied: "But that's the time she should have asked for it. The custody will not be disturbed. The child will have the right to visit its mother and the mother to visit the child, and, if at any time she is not received, I will change the custody and put it in its mother." From that decree the mother of the boy has appealed.

As both parties to this litigation are referred to by the witnesses as "Mrs. Hancock," we refer to them by their given names to distinguish them, Pearl being the mother and Kate the stepmother.

On October 25, 1928, a separation agreement was entered into between the father and the mother of the child, in which it was agreed that they should "at all times hereafter live separate and apart." There was a property settlement, and it was recited in the separation agreement that ". . . The wife surrenders and does hereby surrender the care and custody of their three-year-old child, John V. Hancock, to the husband, to be

at all times hereinafter in the care and custody of the said husband, subject, however, to the friendly visitation of the wife." The recitals of this instrument strongly suggest that it was prepared by the father's attorney.

As recited in the opinion on the former appeal, the father obtained a decree from the mother on the ground of adultery. This decree was rendered December 24, 1928. The parties subsequently lived together as man and wife.

Pearl testified that she was induced to resume that relation upon the representation made to her by her former husband that he had not obtained a divorce. The decree in that case was rendered upon a waiver of service of summons and an entry of appearance, and recited that the mother of the child was an unfit person to have its custody, which was awarded to the father. Pearl denied knowing that this decree had been rendered, and denied having waived service of summons or having executed an entry of appearance in that case.

The father married Kate in January, 1933, and the following year the boy was taken out of school in Memphis, Tennessee, where he had been placed by the mutual consent of his father and of Pearl, and since 1934 the child has lived in Marked Tree, Arkansas. He lived with his father and Kate until July 5, 1938, the date of his father's death, since which time he has lived with Kate. A petition for a writ of *habeas corpus,* was filed by Pearl on August 18, 1938, and this litigation has since been in progress between Pearl and Kate, both of whom love the child dearly, and to award the custody of the child to either one of these women will wring the heart of the other.

It appears that Pearl labored under the apprehension that the father of the child had a preferential right to its custody, but it is certain that she never abandoned it. Her visits to the child became less frequent, but she explained that this was true because they became more and more unpleasant, made so by the hostile attitude of Kate. Pearl appears to have preserved such contacts

with the child as were reasonably possible under the circumstances. She sent him a number of small gifts, many of these being her own handiwork, and she corresponded with him. She sent him, among other things, a Boy Scout knife, which he returned. Under date of January 12, 1938, he wrote Pearl that his father did not wish him to receive any more gifts from her. But before writing this letter, he wrote another in most affectionate language, in which he suggested that he get a postoffice box so that the correspondence might not be interrupted. The import of this suggestion cannot be mistaken.

The testimony of the boy shows that he possesses a very high degree of intelligence for one of his age, and it shows also that he not only has a deep affection for Kate, but that he has acquired a fixed aversion for his mother. He attributes his attitude to Pearl to what he said his father told him about her.

It may be that Pearl will be unable to win back her son's love and devotion, but we think she should have that opportunity. This remains to be seen. It is true Pearl surrendered the custody of her child when, as the chancellor said, she should have contended for it, but that custody was surrendered to the father, and, as we have said, there is no evidence that she ever abandoned the child, and she sought to recover its custody as soon as the child's father died. Pearl had never surrendered the custody of the child to Kate, but to its father, and, as we have said, she labored under the impression that the father had this preferential right, which was the law prior to the passage of the act now appearing as § 6205, Pope's Digest.

The recent case of *Holmes* v. *Coleman*, 195 Ark. 196, 111 S. W. 2d 474, announces the rule which we think is applicable here. We there said: ''Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life. When, however, the

natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, it then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home, and when they have done so and, through their attentions to it, have learned to love it as if it were their very own child, this bond of affection will not then be severed, although the natural parent may later repent his breach of the laws of nature and of the state and offer to resume the duties and obligations which he should never have ceased to perform.''

We conclude, therefore, that the decree, awarding custody of the child to Kate, should be reversed, and its custody will be awarded to Pearl.

