GRINDER *v.* HARRELL.

4-7679                    188 S. W. 2d 307

Opinion delivered June 25, 1945.

*W. F. Reeves,* for appellant.

*N. J. Henley,* for appellee.

SMITH, J.   Windell Grinder and Birdie Harrell were married in Searcy county on May 7, 1943, and after living together as man and wife for about two months separated, and were divorced in a suit filed by the husband, that decree being rendered April 5, 1944. In February, 1944, a boy child was born to this union, and the right to its custody is the subject-matter of this litigation. No reference to the child was made in the divorce decree. In

August, 1944, Birdie married N. A. Caughron, with whom she lived, with her baby, until her death.

Birdie's father and mother had moved from this state to Oklahoma after her marriage to Caughron, where her father had arranged to make a share crop. She sustained an injury from a collision with an automobile and died as a result thereof on December 20, 1944. Upon being advised of Birdie's injury, her mother returned from Oklahoma and was with her when she died. After Birdie's funeral Windell made demand on Bertha Harrell, Birdie's mother, for the custody of his child, which demand was refused. Mrs. Harrell announced her intention to take the child with her to Oklahoma, whereupon Windell brought *habeas corpus* for the child. The writ issued and the case was heard on December 29, 1944, and the custody of the child was awarded to Mrs. Harrell, who was required to execute a bond in the sum of $100, conditioned that Mrs. Harrell would return the child to this state, if ordered so to do by the court, and this appeal is from that decree.

The divorce decree recites that it was granted on account of Birdie's immoral conduct, but Windell appears to have regarded his marital obligations as lightly as did Birdie.

Before obtaining the divorce Windell went to California, where he secured employment in a war plant at a wage of $1.30 per hour, which he dissipated on a woman with whom he admitted immoral relations. Windell was employed there for five months and without saving any money, returned home. He proposed to resume the marital relations with his wife, and told her mother that if she would loan him $65 to pay his fare to California he would return there and secure employment, and send for Birdie. The loan was made, and Windell returned to California, and again secured employment in a war plant, but he did not send for Birdie, and only repaid $10 of the loan made him by Birdie's mother.

Windell admitted that he had no home of his own to which to take the child, as he was living at the home of his father and mother, but his father and mother both

testified that they wanted the child and would gladly take it into their home. They are not parties to this litigation and have never had the custody of the child.

Birdie's mother testified that when Windell deserted Birdie she was left without a home, and that she took Birdie into her home and paid her lying-in expenses when the baby was born, and that Windell made no contribution on this account.

Windell testified that he offered to make contributions, but his wife declined to accept them.

Mrs. Harrell testified that she wanted to keep the child, and would rear it as one of her own. Birdie's father did not testify and we do not know what his attitude is.

If this were a controversy between the parents of the child for its custody we would have no hesitancy in awarding the custody to the mother. Indeed, Windell never sought the custody of the child during the life of its mother, but upon her death he demanded its custody, and brought this suit to enforce that right.

In the recent case of *Hancock* v. *Hancock,* 198 Ark. 652, 130 S. W. 2d 1, we quoted and reaffirmed the following statement taken from the case of *Holmes* v. *Coleman,* 195 Ark. 196, 111 S. W. 2d 474:

''Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life. When, however, the natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, it then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home, and when they have done so and, through their attentions to it, have learned to love it as if it were their very own child, this bond of affection will not then be severed, although the natural parent may later repent his breach

of the laws of nature and of the state and offer to resume the duties and obligations which he should never have ceased to perform.''

Here it is not shown that Windell ever abandoned the child, he only consented that it remain with its mother and this custody would have, no doubt, been awarded her had he objected.

There was testimony to the effect that Windell had expressed doubt as to the paternity of the child, but this he denied. He testified that he did not doubt that he was the child's father.

We have concluded that a case was not made which would warrant or require us to deprive the father of his presumptive right to the custody of the child, nor do we think it would be to the best interests of the child that this should be done.

Windell's father and mother testified that the child was ten months old at the time of the trial, that they owned a farm of 110 acres, in Searcy county, most of which was in cultivation, and that they did not owe anyone anything, and that they would gladly take the child into their home and care for it, and that Windell was living with them as a member of their family. There were two other children in the home, one aged 12 years, and the other 16 years. Their home is near a school which will be available to the child when it is old enough to attend school, and there is no intimation that Windell's father and mother are not sober and industrious people.

This is more than can be said for Birdie's father and mother. Mrs. Harrell admitted visiting a ''honky-tonk'' where intoxicating liquors were sold. She was asked, ''You did drink some while you were there,'' and she answered, ''Yes, sir, I took a few drinks, but I sure did not get drunk.'' She was asked if it was a habit of both hers and her husband to drink and she answered, ''We drink a little, my husband gets drunk once in a while but I sure don't.'' She was asked, ''When he has whiskey around there, don't you drink about as often

as he does?'' and she answered, ''He hardly ever has any at home, he drinks it before he comes home.''

Mrs. Harrell testified that in addition to the child here in controversy, there were five other children in her home, whose ages were from five to sixteen years. She admitted that on various occasions she had left the children unattended in the home, but stated that this was ''just a little while at a time.''

Upon consideration of the testimony we have concluded that the child's welfare, which is our chief concern, constrains us to find and hold that the environment of the home of appellant's father and mother is more conducive to the best interests of the child than that of appellee's family.

The decree will, therefore, be reversed, and the cause remanded with directions to award the child's custody to its father, and for such action as may be necessary to make this order effective.