McGraw *v.* Rose.

5-487                                        271 S. W. 2d 912

Opinion delivered October 25, 1954.

*Robinson & Edwards,* for petitioner.

*Agee & Partain,* for respondent.

GRIFFIN SMITH, Chief Justice.   James Lloyd Rose
and his wife, Betty—whom he married in 1948—had one
child, Allan Gale, now five and a half years of age.   James
Lloyd died in September, 1953.   At that time he was living
with his mother.   His own father had died more than
fifteen years ago and in 1940 or 1941 his mother married
Lonnie Rose, who was Mrs. Rose's first husband's
brother.   She is 49 years of age and Lonnie is 61.

The child, Allan Gale, has been with its paternal
grandmother and her husband for some time.   Following
her remarriage Betty sought by *habeas corpus* to regain
custody of her child.   The writ was dismissed and we treat
the cause as having been brought up by *certiorari* for
review.

For some time after their marriage in 1948 James
Lloyd and Betty lived with Betty's parents at Grand
View, in the state of Washington.   James Lloyd was ad-
dicted to drink, according to Betty's testimony, and failed
to provide the reasonable necessaries of the home.   He
also incurred obligations beyond current means.

In October, 1949, when the baby was about eight
months old, Betty and her husband came to Arkansas
and lived with James Lloyd's mother and his step-father
at Cedarville for a period of six months.   Betty's testi-
mony is to the effect that the grandmother and her hus-
band quarreled a great deal.

At the end of eight months Betty left for a visit with
her parents in Washington.   She had concluded that her
marriage was a failure, and intended to leave James
Lloyd and procure a divorce.   Her husband, however,
refused to allow her to take the baby.   His action in this
respect was encouraged by other members of the family.
Mrs. Lonnie Rose had physical possession of the boy.
Betty remained in Washington a week, then borrowed
money and returned to Arkansas.   She was accompanied
by her mother and an uncle.   Betty's version of this
transaction is that, with the uncle, she went to the Rose
home, picked up the boy, and asked where his father was.
She was told that James Lloyd was in the garden, but

"Instead of going to see the baby's daddy I just went to the state of Washington."

Two months later James Lloyd went to Washington to determine whether his wife would return. There was a reconciliation to the extent that Betty went with her husband to Susanville, California, remained there for eight or nine weeks, and then a second separation occurred. According to Betty's version of discomfitures and matters rendering her situation intolerable, "Grocery bills were piling up and I didn't know whether we were going to get credit any more. I had made arrangements to sell my rings and silverware and take my son back to Washington to my parents. I was going to do this while James Lloyd was at work, but he found out from some one what I intended to do and told me I could leave, but that I couldn't take Allen Gale. . . . He told me that if I tried to take the baby he would shoot me, [and] he was the type I was scared enough of to believe he would do it. He had a police record."

Betty testified that she left for Washington to join her parents, fearing to take the child. About a year later she sued for divorce. In the meantime—possibly three or four months after leaving her husband—Betty began keeping company with Robert Paul McGraw, who was also married, but separated from his wife. His former wife visited with him in the home of Betty's mother and father.

The divorce proceedings in Yakima county, Washington, were attended by James Lloyd, who was represented by an attorney. When at the first hearing it developed that the baby was not within the court's jurisdiction an adjournment was ordered, the purpose being to permit the father—under court direction—to bring the child to Washington. This was not done, and at the second hearing the judgment in Betty's favor was for custody of the child, $50 per month support money, and cost of the action, including an attorney's fee.

The petitioner's husband, Robert Paul McGraw, owns 160 acres of productive farming land near Masonville,

Iowa, and receives from this property $2,000 or more per year, in addition to the agricultural products personally used.

Lonnie Rose and his wife rent their home. For a time Mr. Rose worked as janitor at one of the schools, but he is a world war veteran and draws monthly compensation of $70. When Mrs. Rose was asked regarding her husband's physical condition her answer was that he was extremely nervous. At one time he had taken carbolic acid and was sent to a hospital. There is evidence that the sons of her first marriage, or at least some of them, had drinking habits and were not always within the law.

On the whole, however, the record fails to disclose anything but a sincere purpose on Mrs. Rose's part to do the best by the child that circumstances will permit.

Some of the witnesses thought that on one or two occasions Mrs. McGraw had punished the child to spite her husband and had gone so far as to attempt to choke it. The evidence on that point is not at all convincing and we doubt that the Chancellor gave it serious weight.

If testimony of the grandmother and others interested in her point of view is to be accepted, Mrs. McGraw abandoned her child. But the mother's explanations regarding marital difficulties and references to the unfavorable economic position into which she was thrust go far to discount the contention of abandonment. The law's policy is to permit children to remain with their parents unless there is the most compelling reason for deviation from this normal social status; and this rule is ordinarily emphasized when small children are concerned. Unless abandonment is clearly shown, or unless unnatural proclivities upon the part of parents is established, such as cruelty or negligence amounting to parental indifference, the superior claim of a father or mother is given first consideration. *Hancock* v. *Hancock,* 198 Ark. 652, 130 S. W. 2d 1; *Hazelip* v. *Taylor,* 209 Ark. 510, 190 S. W. 2d 982.

In the case at bar the father is dead and the mother and her present husband are shown to be economically able to rear the child in an environment, we think, more conducive to good citizenship than would be the case if the grandmother and Lonnie Rose were permitted to retain custody.

Reversed, with directions that the writ be granted.