**STATE of Missouri, Respondent,**

v.

**Edwin L. BAKER, Appellant.**

**No. 54547.**

Supreme Court of Missouri, Division No. 2.

May 11, 1970.

John C. Danforth, Atty. Gen., Thomas L. Patten, Asst. Atty. Gen., Jefferson City, for respondent.

Stanley I. Dale, Whitney W. Potter, Joseph L. Flynn, St. Joseph, for appellant.

BARRETT, Commissioner.

By information the appellant, Edwin L. Baker, and his wife, Josephine T. Baker, were charged with manslaughter in an attempt to produce or promote an abortion upon Janet, age 24, by the administration of a drug. Specifically the information alleged that *"on or about the 13th day of July,* 1968 * * * Edwin L. Baker and Josephine T. Baker did feloniously, with the intent to produce or promote a miscarriage or abortion * * * *administer to a woman,* to-wit, one Janet * * * *a drug"* and that as a result of the acts of the Bakers Janet died. Upon a severance and change of venue Edwin Baker was separately tried, found guilty of manslaugh-

ter "as defined in Instruction 6" and his punishment fixed at ten years' imprisonment. Instruction 6 submitted and hypothesized that "Edwin L. Baker, either alone or acting with his wife, Josephine T. Baker, *did* then and there with the intent to produce or promote a miscarriage or abortion *administer* to a woman by the name of Janet * * * *a drug*, and that *as a direct and proximate result of the administration of said drug*," Janet died.

In brief outline these are the background circumstances of the charge and verdict: Ronald Niemiec, age 26, and Janet, both from Detroit, although not married, moved to St. Joseph where they lived together, sometimes as husband and wife. In the course of their relationship they had two children who were "adopted out through the welfare and social workers." In April or May of 1968 it was discovered that Janet was again pregnant and this time Niemiec went in search of an abortionist and finally was referred to Baker, an ice-truck driver, as a well-known abortionist. On Thursday, June 27, 1968, Niemiec drove Janet to Baker's home, 2619 Faraon Street, and waited in his automobile about an hour while Janet, after being met by Mrs. Baker, went inside. The next day, Friday, June 28th, Niemiec and Janet got and cashed their weekly pay checks and with his $80.00 and her $45.00 in cash and after the purchase of "a douche thing" and Kotex they returned to the Bakers and this time he waited outside about forty-five minutes. Again Niemiec did not see Baker but he says that as on the day before he saw that "his car was there." The next day was Saturday, June 29, and Niemiec worked until noon but about 12:30 again drove to the Bakers and Janet walked up to the car and then to the duplex and Mrs. Baker "let Jeannie in," and "(t)here was someone peeking out of the curtains" but again he did not see the appellant. Janet was inside the house about an hour and after she came out Niemiec took her home to her apartment—they were then living in separate apartments. Twelve days later,

on Friday, July 12, 1968, Niemiec and Janet returned to the Bakers and again he waited outside about forty-five minutes. While he was waiting a rainstorm developed and he saw Mrs. Baker run out and roll up the windows on her husband's Mercury. Again he took Janet to her apartment and the next day, *Saturday, July 13, 1968*, about 7 o'clock in the morning on his way to work he stopped at Janet's for coffee and saw her alive for the last time. As he left Janet "She said she was going to get a shot," she told him that "at 2:30 she was going to see Mr. Baker and get a shot." Niemiec got off from work shortly after 3 o'clock and immediately went in search of Janet. He finally became frantic and between 6 and 7 o'clock went to 2619 Faraon but Mrs. Baker in response to his questions "Where is Jeannie? * * * Where is Jeannie, the girl with the long hair?" said, "She didn't show up, she didn't come over here today." On this occasion, it was dark inside the house, he saw a man "sitting on the living room floor" but he could not identify the man as Baker. Niemiec made repeated calls to the Bakers, on one occasion Mrs. Baker said, "We told that girl to go see a doctor and get a D & C." And finally, with his friend Duffy, Niemiec confronted Baker in his back yard while he was washing his automobile and when Baker said "Is somebody missing?" directly accused him: "You gave her an abortion, Baker." But Baker said, "That's surgery. * * * I wouldn't do anything like that." After the police had intervened and arrested Niemiec, his companion and the Bakers, Niemiec again challenged Mrs. Baker about the day of the rain and she said, "That's the day this strange girl came to the house with the long hair. She asked for an *Ervin* Baker," used the phone and left.

On Monday, July 15, 1968, Mr. Delaney who lived about 6 miles south of Stewartsville was "smoothing" his roadway with a bulldozer when he came upon the body of a young woman, Janet, in the edge of the water of Castile Creek. She had been dead

between 24 and 48 hours. She was naked and her clothes, shoes, pocketbook and wallet were never found. It is not necessary to describe the autopsy in detail or to relate in full the pathologist's testimony. On the forehead, just above the hairline, there was "a defect in the skin," not a "severe traumatic wound, if it is a wound at all." Most important here: "There is a very slightly swollen area in the right upper quadrant of the right hip." An incision into the skin revealed "some hemorrhage" which the doctor called "antemortem." He described it in this language: "There is a slightly raised area which measures at least 10 cm. across which, to this examiner, might be interpreted as the type of skin change noted in a hornet's or bee's sting: that is, there is a diffuse swelling of the skin and subcutaneous tissue." He said that her breasts indicated a state of pregnancy. In describing the vaginal area Dr. Kernodle said, *"No surgical instrument marks can be identified: that is, there is no evidence of an operative procedure."* Again in his report and describing the uterus he reported, "There is no blood clot in the opening, only mucus, *and there does not appear to be evidence of any type of instrumentation."* Opening the uterus the amnion membrane was intact and normal and inside was the fetus of a male ten to twelve weeks old. And here the doctor repeated, "It must be emphasized at this time that *no instrument wound is found in the cervix of the uterus, the uterus itself, the vagina or any portion of this part of the body."*

Before coming to the essential problem involved here it is necessary to interpolate that on July 18, 1968, a lady in walking up the alley to the rear of the Bakers' residence came upon a pasteboard box, near their garbage drum, which she picked up and gave to the police. The empty box was a Parke, Davis & Company drug box which once contained five doses of penicillin and streptomycin. Also it should be said that a number of Janet's organs, uterus, kidneys, liver and intestines were ex-

amined by the FBI in Washington and "No drug substances were identified in these tissues." As to Pitocin, a trade name for a drug, oxytocin, designed to hasten childbirth or to induce a miscarriage, the report was: "There is no method known to this Laboratory for the chemical identification of Pitocin or its analogues in postmortem tissue."

The state to establish its case put this hypothetical question to Dr. Kernodle and another pathologist: "Now, Doctor, I will ask you to assume that the girl upon whose body you performed the autopsy was last seen alive on July 13, at which time she appeared to be in good health and spirits, and to assume further that her nude body was found in a rural area on July 15, and to assume further that chemical tests were made of the liver, kidneys, lungs, intestines, uterus and spleen for acid, basic and neutral drugs, and that no drug substance(s) were identified, and to further assume that when the girl was last seen alive she was entering the home of the defendant where she was going for the purpose of obtaining a shot, and I will ask you to assume those facts and in addition the findings that you made when you performed the autopsy, and I will ask you if based upon those facts you have an opinion with reasonable medical certainty as to the cause of this girl's death?" This question was modified some on objection and is employed here only because of its fullness. The doctor answered, as did Dr. Wheeler, that he had an opinion as to the cause of Janet's death. His opinion was that she died from "anaphylactic shock," a sudden, violent reaction with complete collapse and death in a matter of two or three minutes. It was his opinion that the swollen area in the right hip was "a probable area of injection of some substance." He said, however, "I have not identified any substance in this region, and beyond that I have no proof of anything." When asked how anaphylactic shock "shows itself in a body" he said "Nearly nothing." While testified to by the defendant's pathologist, Dr. Buh-

ler, it is undisputed that penicillin would not promote or produce an abortion. It was the opinion of Dr. Kernodle and Dr. Wheeler that Janet's anaphylactic shock was due to an injection of penicillin to which she had become sensitized. In conclusion the state's pathologist said, "An absolutely certain proof beyond question of doubt, the cause of death has not been established except as a medical opinion, based upon all of the investigation I have performed up to this time."

The appellant has briefed seventeen separate points attacking the introduction of numerous bits of testimony, challenging instructions and argument but they are all related to and subordinate to the assertion that the state failed to support the charge in the information "in that there was no evidence a drug had been given with the intent to produce or promote an abortion."

The state's proof established that Janet was in the Bakers' home on at least five occasions, June 13, 14 and 15 and July 12 and 13 and thus there was the opportunity for them to have attempted in the language of the statute, "to produce or promote a miscarriage or abortion." There may be a tenuous inference that Baker or his wife were paid $125.00 by Janet to induce an abortion but the problem is whether there is any circumstance or evidence from which it is a permissible inference that they, again in the language of the statute and as charged in the information, "administer(ed)" to Janet or "cause(d) her to take any drug, (or) medicine." In this connection it is assumed that the administration of penicillin, and consequent anaphylactic shock, to prevent infection following an abortion would fall within "to * * * promote a miscarriage." However, on this record, the state's proof all but completely eliminated the possibility of the use of any instrument and the infections often accompanying the use of instruments in abortions. And despite the proximity of the empty penicillin box to their garbage can there is no testimony from which it is a reasonably permissible inference that Baker or his wife acting in concert in an abortion administered a shot of penicillin to Janet. And here the problem is not with the form of the hypothetical question or even with its hypothesis, the problem is whether the question hypothesizes an abortion or the finding of the administration of a drug with the requisite intent to induce or promote an abortion. To excerpt specific questions and answers from Dr. Kernodle upon the very crux of the case:

"Q. The fact is—then your testimony here today is that you yourself found no evidence of any—any medical evidence of any drug being injected into this woman?

A. I have to admit that's correct.

   \*     \*     \*     \*     \*     \*

Q. Is there any evidence of any instrument being used, such as would be used to produce or promote an abortion?

A. No, sir.

Q. Now, Doctor, there are drugs which do produce and promote abortions, are there not?

A. I don't like to answer your question like you place it. I mean like you submit it to me because they don't cause abortions directly. They kill the fetus and the woman aborts.

   \*     \*     \*     \*     \*     \*

Q. There are drugs that are used that way?

A. Yes, that's right.

Q. Now would a drug such as that cause an anaphylactic shock?

A. I have never seen it myself.

Q. You know of none that would cause an anaphylactic shock yourself, do you?

A. No, sir.

Q. *Then as far as you are concerned, Doctor, in examining the body of this girl you found no evidence of any attempt either by a drug or by an instrument to produce or promote a miscarriage or abortion?*

A. *That's right."*

In these briefly excerpted circumstances it is not necessary to distinguish cases, to elaborate upon the substantive law of abortion and its essentials or to consider the objections to certain evidence and instructions. In general it is sufficient to say in passing that it is possible to sustain an abortion prosecution in some circumstances without the aid of expert testimony, as for example by the testimony of the victim or an eyewitness. Commonwealth v. Fisher, 204 Pa.Super. 255, 203 A.2d 364; State v. Miller, 364 Mo. 320, 261 S.W.2d 103. And where there is proof of the ingestion or administration of a drug (as excessive dosages of aloes) it is permissible for experts to testify and give opinions as to the effect or tendency of such a drug to induce an abortion. State v. Shaft, 166 N.C. 407, 81 S.E. 932. It is not permissible or proper, however, to allege the use of instruments to induce an abortion and prove without charge the use or administration of drugs, or conversely to allege a drug and prove the use of instruments. State v. Willson, 113 Or. 450, 230 P. 810, 233 P. 259; State v. Sonner, 253 Mo. 440, 161 S.W. 723. But here, whether by instrument or by drugs, the proof is insufficient to support the inference of Baker's use or administration of either to or upon Janet. In comparable and sometimes in more compelling circumstances this court has said, "Instruction number 2 authorized them to find the defendant guilty if he administered the drugs with such an intent. There was no evidence on which to base it. * * * We hold that there was no evidence on which the defendant could be convicted of administering drugs to the prosecuting witness." State v. Stapp, 246 Mo. 338, 340, 341, 151 S.W. 971, 973. In State v. Sonner, 253 Mo. 1. c. 446, 161 S.W. 1. c. 725, the court said, "It will be noted that, under the present information, it becomes necessary to prove that the death of the quick child was occasioned by the use of some drug. The present evidence fails to show that the death of the quick child was so caused. On the other hand, the evidence tends to show that the severing of the head of the fetus, prior to its delivery, by the use of some instrument, by some unknown person, was perhaps the possible cause of its death." Without demonstration the following is a list of instrument cases controlling in principle, all holding that the proof was insufficient to support the charge of manslaughter by abortion. State v. Helton, 255 Mo. 170, 164 S.W. 457; State v. Keller, 287 Mo. 124, 229 S.W. 203; State v. Goodson, 299 Mo. 321, 252 S.W. 389; State v. Smith, 344 Mo. 1129, 130 S.W.2d 550.

The zeal and industry of the state's attorneys and law enforcement officials, city and state, are indeed commendable and afforded another opportunity they may be able to unearth sufficient additional circumstances to sustain a conviction and therefore the cause is reversed and remanded. State v. Goodson, 299 Mo. 1. c. 331, 252 S.W. 1. c. 392; State v. Sonner, 253 Mo. 1. c. 447, 161 S.W. 1. c. 725; State v. Smith, 344 Mo. 1. c. 1137, 130 S.W. 2d 1. c. 555.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.