Adawna DEVINE *v.* Linda R. MARTENS
and Tim Martens

06-859                                                    263 S.W.3d 515

Supreme Court of Arkansas
Opinion delivered September 27, 2007
[Rehearing denied November 1, 2007.*]

---

* GUNTER, J., would grant rehearing.

*White & Greenaway Law Office*, by: *Karen Pope Greenaway*, for appellant.

*Taylor Law Firm*, by: *John Mikesch*, for appellees.

DONALD L. CORBIN, Justice. Appellant Adawna Devine appeals the Washington County Circuit Court's order granting permanent guardianship of the minor child Syris Norelli to Appellees Linda R. and Tim Martens. On appeal, Devine raises three arguments for reversal: the circuit court erred in (1) exercising jurisdiction created solely by the Martenses' unjustifiable conduct; (2) granting the Martenses' petition for an emergency temporary guardianship because there was no imminent danger to the life or health of Syris if he was removed from the Martenses' home and returned to his home with his natural mother; and (3) appointing the Martenses as Syris's permanent guardians where there was a fit natural mother seeking to retain custody of her child. This case was originally before the Arkansas Court of Appeals; however, it was certified to this court pursuant to Ark. Sup. Ct. R. 1–2(b)(1), (4), and (5) as it involves an issue of first impression, an issue of substantial public interest, and an

issue needing clarification or development of the law. We reverse and hold that the circuit court erred in granting permanent guardianship to the Martenses.

Syris was born on September 17, 1998, in San Francisco, California, to Devine and Jason Norelli. Syris was the subject of two California custody actions, with the last order being entered on February 13, 2002, granting sole legal and physical custody to Devine. Prior to this order, in December 2001, Devine moved with Syris to Elkins, Arkansas, where they lived with the Martenses. Following this, Devine moved to New Orleans, Louisiana. There is some dispute as to when and for how long Syris lived in Louisiana with his mother prior to April 2003, but there is no doubt that he lived there with Devine in April and May 2003. In May 2003, Devine moved to New York City, New York, without Syris, to set up house as she had in Louisiana. During this time, Syris stayed with the Martenses. In November 2003, Devine returned to Arkansas to get Syris and together they moved to Austin, Texas. While living in Texas, Syris was enrolled in school during the 2003-2004 and 2004-2005 school years.[1]

While Devine and Syris were living in Texas, the Martenses visited them on three separate occasions. Specifically, Mr. Martens testified that: (1) in March 2004, he and his wife visited and stayed with Syris in his room; (2) in December 2004, he and his wife went to Texas and picked up Syris for a two-week period, at the end of which they returned Syris to Texas; and (3) in May 2005, they picked up Syris this most recent time. This May pick-up was scheduled in the spring of 2005 when Devine and Mrs. Martens agreed that Syris could visit with the Martenses during the summer with the understanding that Syris would return to Texas for the 2005-2006 school year. Toward the end of the summer, Syris's visit was extended so that he could attend the Feast of the Tabernacles, a religious festival, with the Martenses in October 2006. Rather than interrupting his schooling, both Devine and the Martenses agreed that he should be enrolled in school in Arkansas. It was understood that Syris would return to Texas on December 31, 2005, so that he could continue school there for the spring semester.

Despite their agreement, the Martenses failed to return Syris to Texas. Initially, they told Devine that the return had been

---

[1] Devine had also enrolled Syris for the January 2006 semester.

delayed from Saturday to Tuesday or Wednesday, during which Devine expressed her concern over Syris missing school and insisted that they return Syris before January 6, 2006, because Norelli was flying in from California to visit his son. When Syris was not returned, Devine e-mailed and made multiple calls to the Martenses in an effort to find and retrieve her son. On January 8, 2006, after receiving no response, Devine and Norelli drove to Arkansas to pick up their son. Upon arriving, on January 9, 2006, Devine contacted the local police chief who phoned Mr. Martens and told him that Devine was there to pick up Syris.

That same day, on January 9, 2006, the Martenses filed a petition for appointment of guardian of the person and for emergency temporary guardianship. The circuit court entered an ex parte emergency order for temporary guardianship that same day, and scheduled an emergency hearing on the petition for January 12, 2006. Following this hearing, the trial court entered an order granting emergency temporary guardianship to the Martenses. On March 17, 2006, a hearing was held on the petition for permanent guardianship.

On April 7, 2006, the circuit court entered an order giving permanent guardianship of Syris to the Martenses. In this order, the circuit court determined that California no longer had continuing, exclusive jurisdiction of matters involving Syris, and found that it had jurisdiction to determine matters involving his care, custody, and control.[2] Furthermore, the circuit court found that both biological parents were unfit to have custody of Syris, the Martenses were duly qualified and thus the proper persons to have guardianship of Syris, and it was in the best interests of Syris that guardianship be granted to the Martenses. Specifically, in finding that Devine was an unfit parent, the circuit court cited to the multiple occasions in which Devine turned over responsibility of Syris to the Martenses as well as the court's finding that:

> she has not provided a stable home environment, has exposed him to a home with "art" not suitable for viewing for a young child and nude pictures of herself, has been guilty of educational neglect in

---

[2] On April 7, 2006, prior to issuing its order, the circuit court held a teleconference hearing with Judge Appel of the Superior Court of California, County of Alameda, as well as the parties involved in this case. During that hearing, Judge Appel concluded that, under these circumstances and with his focus being on the best interests of the child, it was appropriate for his court to decline to exercise jurisdiction.

that there is conclusive evidence that the child has suffered star-tlingly excessive absences and tardies from school resulting in criminal action; also she has had an Internet presence for herself which would be inappropriate for her young child to see; she has not given any consideration to the thought that her son or his friend might see her pictures on the Internet or the appropriateness of that result. She has provided a home environment that, while the child was there, was dirty and smelled of urine and was open to public view; the child developed bladder and bowel problems living with her.

Lastly, the April 7 order set out a visitation and child support plan for both Devine and Norelli.

On May 5, 2006, Devine filed a notice of appeal from the April 7 order. On May 26, 2006, the circuit court entered an amended order for guardianship. The amended order was virtually the same as the original order with most of the amendments being made to the visitation plans. In addition, the circuit court reiter-ated its belief that Devine was unfit to be Syris's primary custodian but should have unsupervised visitation with the child. On August 30, 2006, Devine filed an amended notice of appeal appealing the May 26 amended order for guardianship and the April 7 order for guardianship. She also sought and was granted an order allowing her to file a supplemental notice of appeal to include the amended order for guardianship. Her appeal is now properly before this court.

### Standard of Review

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *See Thomas v. Avant*, 370 Ark. 377, 260 S.W.3d 266 (2007); *Freeman v. Rushton*, 360 Ark. 445, 202 S.W.3d 485 (2005). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *See Artman v. Hoy*, 370 Ark. 131, 257 S.W.3d 864 (2007). When reviewing the proceed-ings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses. *See Freeman*, 360 Ark. 445, 202 S.W.3d 485.

### Jurisdiction

Devine's first argument for reversal is that the circuit court erred in exercising jurisdiction created solely by the Martenses'

unjustifiable conduct. Specifically, Devine claims that the circuit court should have declined to exercise its jurisdiction as required by Ark. Code Ann. § 9-19-208(a) (Repl. 2002). Moreover, Devine challenges the emergency temporary guardianship order because the circuit court's exercise of jurisdiction in this case did not fall within the exceptions set out in Ark. Code Ann. § 9-19-204 (Repl. 2002). Specifically, Devine argues that the circuit court clearly erred both in finding that she had abandoned Syris and that an emergency existed which created an unreasonable risk of harm or illness to Syris. Thus, Devine's jurisdictional argument hinges upon whether the circuit court had jurisdiction to enter a temporary emergency guardianship under section 9-19-204 of the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA).

We have recognized that the UCCJEA is the exclusive method for determining the proper state for jurisdictional purposes in proceedings involving matters of child custody that involve other jurisdictions. *See Thomas*, 370 Ark. 377, 260 S.W.3d 266. A stated purpose of the UCCJEA is to avoid relitigation of child-custody determinations in other states. *Id.* The UCCJEA sets forth jurisdictional requirements for four types of situations: (1) initial child-custody determinations; (2) continuing jurisdiction; (3) jurisdiction to modify a prior determination; and (4) temporary emergency jurisdiction. Ark. Code Ann. §§ 9-19-201 to -204 (Repl. 2002). Moreover, a trial court has the discretion to decide whether it should exercise or decline to exercise its jurisdiction when there is another appropriate forum under the UCCJEA. *See* Ark. Code Ann. § 9-19-207 (Repl. 2002). However, if this court concludes that the lower court was without jurisdiction, dismissal is an appropriate disposition of the case. *See Koonce v. Mitchell*, 341 Ark. 716, 19 S.W.3d 603 (2000).

In the present case, the Martenses sought emergency temporary guardianship and permanent guardianship of Syris. Previously, in 2002, a California court had granted custody of Syris to Devine. Section 9-19-203 sets forth the requirements for jurisdiction to modify a child-custody determination and states:

> Except as otherwise provided in § 9-19-204, a court of this state may not modify a child-custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under § 9-19-201(a)(1) or (2) and:

(1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under § 9-19-202 or that a court of this state would be a more convenient forum under § 9-19-207; or

(2) a court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

Section 9-19-201(a)(1) provides:

(a) Except as otherwise provided in § 9-19-204, a court of this state has jurisdiction to make an initial child-custody determination only if:

(1) this state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six (6) months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

Here, the circuit court determined that it had jurisdiction for the purposes of the temporary emergency guardianship hearing based upon the facts that (1) Syris had lived in Arkansas for at least seven and a half months prior to the filing of the petition; (2) Arkansas is his home state; (3) there had been a prior order regarding custody from California but neither Devine, Syris, nor a person acting as a parent had lived in California since 2001; and (4) Syris has had no significant contacts with California since leaving there in 2001. However, in determining jurisdiction as to the emergency temporary guardianship the circuit court should have been guided by section 9-19-204. Thus, the issue is whether the circuit court had jurisdiction to enter an order of temporary emergency guardianship.

Section 9-19-204 provides, in pertinent part:

(a) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been *abandoned* or it is necessary in an *emergency* to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

. . . .

(c) If there is a previous child-custody determination that is entitled to be enforced under this chapter . . . any order issued by a court of this state under this section must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under §§ 9-19-201 – 9-19-203. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires.

(d) A court of this state which has been asked to make a child-custody determination under this section, upon being informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of a state having jurisdiction under §§ 9-19-201 – 9-19-203, shall immediately communicate with the other court. A court of this state which is exercising jurisdiction pursuant to §§ 9-19-201 – 9-19-203, upon being informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of another state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order. [Emphasis added.]

For the purposes of this statute, " '[a]bandoned' means left without provision for reasonable and necessary care or supervision." Ark. Code Ann. § 9-19-102(1) (Repl. 2002).

■ In the present case, Devine challenges the circuit court's order granting emergency temporary guardianship to the Martenses because the circuit court clearly erred both in finding that she had abandoned Syris and that an emergency existed which created an unreasonable risk of harm or illness to Syris. As stated above, a court has temporary emergency jurisdiction pursuant to section 9-19-204 if the child is present in Arkansas and has been abandoned *or* an emergency exists to protect the child because the child is subjected to or threatened with mistreatment or abuse. Here, there is no dispute that Syris was present in Arkansas. Also, the circuit court found that Syris had been abandoned *and* that an emergency existed which created an imminent danger to the safety and health of Syris. Because we hold that an emergency existed forming the basis for jurisdiction under section 9-19-204, it is unnecessary to address whether Devine abandoned Syris.

Moreover, Ark. Code Ann. § 28-65-218(a) (Repl. 2004) authorizes a circuit court to award temporary guardianship if there is imminent danger to the life or health of the incapacitated person. These two statutes can be read in harmony; thus, the issue of whether an emergency exists hinges upon whether there is an immediate danger to the life or health of the child, including actual or threatened mistreatment or abuse. *See Weiss v. Maples*, 369 Ark. 282, 253 S.W.3d 907 (2007) (explaining that statutes relating to the same subject are said to be *in pari materia* and should be read in a harmonious manner, if possible).

In the instant case, the circuit court concluded that it had jurisdiction for the purpose of determining matters of Syris's custody, and granted emergency temporary guardianship pursuant to section 28-65-218. In addition to finding that Devine's lifestyle created a risk of imminent danger to Syris's life or health, the circuit court reasoned that an emergency existed because Devine had "abandoned care of the child on a number of occasions during [Devine's] lifetime, and most recently in May of this last year, to [her] mother and to the step-grandfather" which created an imminent danger to Syris's health and safety. In the present case, we cannot say that the circuit court clearly erred in finding that an emergency existed that warranted the circuit court's exercise of jurisdiction over the temporary emergency guardianship petition.

Lastly, the circuit court had jurisdiction, pursuant to section 9-19-203, to determine permanent guardianship. As stated above, Arkansas is Syris's home state, neither Syris, Devine, nor the Martenses have significant connection to California, and there is no substantial evidence in California concerning Syris's care, protection, training, and personal relationships. Thus, the circuit court correctly concluded that it had jurisdiction to determine matters involving Syris's care, custody, and control. Moreover, prior to rendering its final decision on permanent guardianship of Syris, the circuit court contacted the California court and Judge Appel declined to exercise continuing jurisdiction. As such, the circuit court had jurisdiction to determine both the temporary and permanent guardianship.[3]

---

[3] Because an emergency existed as a basis for temporary emergency jurisdiction and because the circuit court contacted the California court, which declined to exercise jurisdiction, prior to issuing its order of permanent guardianship, Devine's argument regarding the

## Temporary Emergency Guardianship

Devine's second argument for reversal is that the trial court erred in granting the Martenses' petition for an emergency temporary guardianship because there was no imminent danger to the life or health of Syris if he was removed from the Martenses' home and returned to his home with his natural mother. Specifically, Devine claims that the circuit court's findings that she had abandoned her son and that her current lifestyle constituted an emergency which created imminent danger to the life or health of Syris are clearly erroneous.

Again, we cannot say that the circuit court clearly erred in finding that an emergency existed which warranted the grant of temporary emergency guardianship to the Martenses. The circuit court heard testimony about Devine's lifestyle and Syris's health that caused concern, as well as testimony that Devine had left Syris with his grandparents for the last seven and a half months. Thus, the circuit court felt it was in Syris's best interest to remain with his grandparents until these issues could be further examined. As such, it is unnecessary to readdress Devine's argument.

## Permanent Guardianship

Devine's final argument for reversal is that the trial court clearly erred in appointing the Martenses as Syris's permanent guardians where there was a fit natural mother seeking to retain custody of her child. Specifically, she claims that the circuit court erred in finding her to be an unfit parent because her actions as a mother did not rise to the level of manifest indifference to Syris's welfare. Therefore, she argues, the circuit court erred in failing to follow the natural-parent presumption, and that it is in Syris's best interests to return home to Texas with her.

Before appointing a guardian, the circuit court must be satisfied that (1) the person from whom guardianship is sought is a minor or otherwise incapacitated; (2) a guardianship is desirable to protect the needs of that person; and (3) the person to be appointed

---

alleged unjustifiable conduct of the Martenses is moot. *See* Ark. Code Ann. § 9-19-208(a). Additionally, her argument that Texas would have had jurisdiction, pursuant to section 9-19-201(a)(1), is without merit as that section deals with establishing jurisdiction in Arkansas, not Texas. Moreover, Texas is not now, nor has it ever been since this petition was filed, a state that would have jurisdiction in this case.

guardian is qualified and suitable to act as such. Ark. Code Ann. § 28-65-210 (Repl. 2004). Where the incapacitated person is a minor, the key factor in determining guardianship is the best interests of the child. *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001); *Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000). However, preferential status may be given to the natural parents of the child under Ark. Code Ann. § 28-65-204(a) (Repl. 2004). *Freeman*, 360 Ark. 445, 202 S.W.3d 485; *Blunt*, 342 Ark. 662, 30 S.W.3d 737. The law prefers a parent over a grandparent or other third person unless the parent is proved to be incompetent or unfit. *Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988). The rights of parents are not proprietary and are subject to their related duty to care for and protect the child; thus, the law secures their preferential rights only as long as they discharge their obligations. *Lloyd*, 343 Ark. 620, 37 S.W.3d 603. This preference, however, is but one factor that the probate court must consider in determining who will be the most suitable guardian for the child. *Freeman*, 360 Ark. 445, 202 S.W.3d 485; *Blunt*, 342 Ark. 662, 30 S.W.3d 737. Nevertheless, it is well settled that:

> *Courts are very reluctant to take from the natural parents the custody of their child*, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life. *When, however, the natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, it then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home*[.]

*Lloyd*, 343 Ark. at 624, 37 S.W.3d at 606 (quoting *Holmes v. Coleman*, 195 Ark. 196, 198-99, 111 S.W.2d 474, 476 (1937)). *See also Hancock v. Hancock*, 198 Ark. 652, 130 S.W.2d 1 (1939).

In the present case, the circuit court found Devine to be an unfit parent because of (1) environmental neglect, (2) educational neglect, (3) questionable moral guidance, and (4) abandonment.[4] The circuit court's decision was based primarily upon the Mar-

---

[4] Our review of the record reveals that Devine did not abandon her son to the Martenses' care. In regards to guardianship cases, abandonment is the act of leaving a child willfully and *without an intent to return*. *Black's Law Dictionary* 2 (8th ed. 2004) (emphasis

tenses' testimony as to Devine's failures as a parent in providing a suitable home and proper care for Syris. While we give great deference to the circuit court's credibility determinations, we conclude that the circuit court clearly erred in finding Devine to be an unfit mother and removing Syris from her care. Specifically, the issues presented here are more akin to issues that typically arise in dependency-neglect cases. In such cases, our State's policy strongly favors reunification with the natural parents above all other alternatives for dependent-neglected juveniles. *See* Ark. Code Ann. §§ 9-27-102 – 9-28-1003 (Repl. 2002 & Supp. 2007). Parents whose children are adjudicated dependent-neglected are generally offered family services and an opportunity to prove they have made improvements that are in keeping with their children's best interests. Additionally, parents who make improvements are, almost without exception, reunited with their children.

In this case, Devine was put on notice that multiple issues existed which the circuit court found to be a basis for removing her son from her care. These issues included: (1) Devine's home being dirty and smelling of urine; (2) Syris developing bladder and bowel problems; (3) Syris having fleas and flea bites when the Martenses picked him up in May 2005; (4) Syris's excessive absences and tardies from school resulting in a Texas truancy action; and (5) Devine's questionable moral guidance, specifically her display of inappropriate wall art and nude pictures of herself and others, as well as her Internet presence. In response, Devine testified that all of these issues never existed or had been corrected.

In regards to the environmental neglect, Devine presented photographs of her home depicting a neat, clean, and appropriately

---

added). While there is no dispute that: (1) Syris had lived with the Martenses from May 2005 until the beginning of this lawsuit in January 2006; (2) the initial length of time for Syris's visit was the summer of 2005, but it was mutually agreed that Syris would continue to stay with the Martenses through the fall semester of school so that he could attend an October religious festival with the Martenses; (3) the Martenses were supposed to bring Syris back to Texas on December 31, 2005, and they did not; and (4) Devine, along with Norelli, drove to Arkansas with her custody papers and contacted the chief of police in an effort to retrieve Syris and bring him back to Texas. Additionally, Devine had enrolled her son in a school closer to their Texas home and Syris's Arkansas teacher commented, on his report card at the end of the third quarter, that she would miss him. A review of the evidence clearly indicates that Devine intended to return, or have Syris returned to her, following his visit with his grandparents. As such, for the purposes of permanent guardianship and the fitness of a natural parent, Devine did not abandon Syris and the circuit court clearly erred in finding this and using it as a basis to remove Syris from her care.

furnished home. Lenell Ripley, Syris's friend's mother, testified that she had been to Devine's home and that it was nice, well kept and did not smell of urine. Devine also testified that Syris had not had a bed-wetting problem or feces in his underwear in over a year, as well as that there had never been an incident where Syris had fleas or was covered by flea bites. Devine also presented evidence of Syris's immunization records and testified that he did not have any medical issues that she was aware of.

As to educational neglect, Devine testified that she was aware that Syris had thirty-seven unexcused tardies and thirty-four unexcused absences, and admitted that she had received a complaint from the truancy court concerning Syris's attendance at school. In regards to this attendance issue, Devine stated that she did not think it was in Syris's best interest to miss so much school, but explained that they had gone through some sicknesses, car problems, and that, at times, she was working three jobs including a night job which sometimes caused them to run late in the morning. She also testified that the school had a one-minute policy for tardiness, and this combined with the school being farther away added to the issue; however, she stated that she had taken steps to rectify the problem. Specifically, on December 16, 2005, in anticipation of Syris's return, Devine applied for entry into an elementary school closer to home in an effort to alleviate some of these concerns with Syris being tardy or absent from school. Devine also explained that she would no longer be working at night and that she would be on a similar schedule to Syris's since she would be going to school full-time, thus remedying most of the absence and tardiness issues.

Similarly, regarding her questionable moral guidance, Devine made significant changes to alleviate the circuit court's concerns.[5] Devine testified, with regards to the wall art, that immediately upon being served notice that the pictures could be deemed inappropriate and were an issue regarding her ability to care for Syris, she had the pictures permanently removed. As to the naked pictures in her bedroom, Devine testified that not now nor has there ever been naked pictures of herself or anyone else in her

---

[5] It is important to note that it is clear to us that the circuit court based its judgment as to Devine's guidance of Syris, in part, upon its own morals and viewpoint of how a child should be raised. This court has made it clear that the state cannot interfere with a natural parents' right to custody simply to better the moral and temporal welfare of the child as against an unoffending parent. *Payne v. Jones*, 242 Ark. 686, 415 S.W.2d 57 (1967).

room, and that all pictures in her room depict her fully clothed. Furthermore, her Internet presence has been decreased as most of the pictures raising concern have been removed from the offending websites.

Furthermore, the attorney ad litem in this case testified that Devine's home was not inappropriate in any way. She testified that the objectionable artwork had been removed and that she believed Devine's assurances that it would not return. The attorney ad litem did not focus her testimony on the problems that allegedly existed before the Martenses filed their petition for temporary and permanent guardianship. She testified as to her opinion of the home at the time that she visited in the course of her representation of Syris. Her opinion was that the home was appropriate and suitable. Lastly, the Martenses did not present any further evidence that any of the prior offending conditions continued or existed at the time of the final guardianship hearing.

In our review, it is clear that Devine took significant action toward rectifying any issues that would keep her from retaining custody of her son. These are the very types of improvements that parents are encouraged to make in the best interests of their child or children, and Devine should not be disparaged for her efforts to improve her home and her parenting skills. Specifically, if, instead of the Martenses filing for guardianship of Syris, a dependency-neglect action had been instituted in this case, Devine would now be reunited with her son. She has already done everything that would have been asked of her. She has corrected every problem about which the circuit court expressed concern. It is true that she has done so because of the threat that her child might be removed from her custody, but such a motive is entirely appropriate when a parent is working toward reunification with his or her child.

This state's courts should not be in the business of permanently removing children from their parents' custody simply because the parents have exercised poor judgment in caring for their children. Just as the Arkansas Juvenile Code recognizes the efforts of parents in dependency-neglect actions to improve their homes and parenting skills, we should encourage and recognize such improvements by parents in guardianship actions. Frankly, it is not in a child's best interests to take custody from a natural parent who has rectified all issues related to his or her fitness, and grant custody to a third party, such as that child's grandparents. As such,

we hold that the circuit court clearly erred in removing Syris from Devine's care and granting permanent guardianship to the Martenses.

Reversed and remanded.

GUNTER, J., dissents.

JIM GUNTER, Justice, dissenting. I would affirm the judgment in this case because the circuit judge was in a better position after two hearings to decide what was in the best interest of the child. While the majority gives lip service to our rule, regarding our deference to the trial judge and his superior position to resolve factual disputes, the majority bases its decision on evidence that was not only disputed by multiple witnesses, but also found to lack credibility. Guardianship and custody cases are the most difficult cases for our courts to decide, and the decision quite often rests on matters which are not evident on the printed page, which is all that we have before us. This was a complicated case with serious charges of neglect made against the mother. The evidentiary disputes were endless. The judge summed up the complicated nature of the evidence in this case, prior to issuing his findings:

> I have had an opportunity now to read over all of the exhibits that have been introduced in the case and I have had an opportunity to observe the witnesses as they have testified; to observe their body language, their demeanor while on the witness stand, the cadence of their testimony, all of those things we look to to determine whether or not a particular portion of somebody's testimony is true. In this case, it's probably more important that I've had the opportunity to personally observe the witnesses because, in this case, there has been a significant amount of testimony purportedly describing the same events that couldn't be more diametrically opposed in terms of what people say happened. So, in this case, as frequently happens, we are obliged to determine credibility.

The grandparents were providing a stable home and a good influence on the child, and the child was beginning to thrive once again. After two hearings, I am satisfied that the circuit judge did what he felt would be in the best interest of the child. In such a case, I would not substitute my judgment for that of the trial judge.

The grandparents raised valid concerns about the child's safety, noting the fact that the mother now had a male roommate. They questioned whether the type of person that would feel

comfortable living in a home decorated with sexually graphic material would pose a danger to the young boy. It is common for a court to determine whether it is appropriate for a child to live with an unmarried parent, who resides with a member of the opposite sex, and the issues that arise from such an inquiry were particularly relevant to this case. While the typical case that addresses this issue involves a dispute between two natural parents, the court, here, was mindful of that distinction and the presumption that existed in favor of the natural parent. While the mother's lifestyle in this case was unusual, the court recognized that such a lifestyle was not, alone, a sufficient basis to shift custody to a third party.

While the evidence of educational neglect did not have the shock value of other allegations, the attendance problems were serious enough that the Texas courts instituted criminal proceedings against Miss Devine. The court summarized the testimony presented by Miss Devine, regarding her child's excessive number of tardies and absences:

> Miss Devine testified that the school attendance of Syris was not particularly a problem. She had, in fact, indicated that to the extent that there was any problem at all she had changed schools to eliminate any difficulties that occurred earlier. The proof demonstrates conclusively to this court that Syris suffered from a staggering number of absences and tardies. Miss Devine and another witness testified that the Austin School District was simply too strict; that they were wrong-headed in their policies. The court did not find that testimony credible. In fact, the court found that the corroborating witness apparently engaged in similar patterns of behavior to Miss Devine, which this court finds appalling. The determination and credibility on this particular issue was determined, in part, by personal observation of Miss Devine's corroborating witness, her method and manner of the testimony and the content of their testimony.

> The court concludes and finds that both witnesses have given less than what the court would call enthusiastic emphasis to the education of their children.

The court then noted testimony that the Martenses presented, regarding the tardies and absences:

> The problem for Syris's tardiness and absences rose to a point which required the City of Austin to institute a criminal case against

Miss Devine for a parent contributing to non-attendance of a child. Although warned about the problem, Miss Devine failed to correct it.

This court concludes and finds that Miss Devine does not, and has not, provided an environment where Syris can receive full benefit of this education.

The court has little difficulty concluding that Syris will be better served living the school year with the Martens. Accordingly, the court concludes that Petitioners have met their burden of proving entitlement to establishment of a guardianship for the child, Syris Norelli, and that request for guardianship is granted.

It is well established that the preference for the natural parent is overcome if the parent is not performing her duty to care for and protect her child. *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001). The trial court found that appellant was not fit, based on its findings of environmental neglect, educational neglect, questionable moral guidance, and abandonment.

The majority reverses the court's findings by relying on testimony that was disputed by numerous witnesses at the hearings. While the trial court had the opportunity to determine which party's evidence was more convincing, by observing the witnesses as they testified, this court does not, and I am not willing to replace the trial court's determinations with my own, when the evidence presented was so drastically conflicting. In addition, I believe that the court's findings are supported by objective evidence, such as school records, communications between Miss Devine and her son's teacher, and evidence regarding the criminal-contempt action in the Texas court system.

Our standard here is clear. We do not reverse the trial court's findings unless we conclude that the finding was clearly erroneous, which means that we are left with a definite and firm conviction that a mistake has been made. Based on the volumes of evidence in this case that support the trial court's decision, I cannot conclude that the decision was clearly erroneous. Accordingly, I would affirm.