2011 Ark. App. 330

**Jeremy HICKS, Appellant**

v.

**Norman FAITH and Wong Duan Faith, Appellees.**

**No. CA 10–1174.**

Court of Appeals of Arkansas.

May 4, 2011.

Floyd Mattison Thomas III, El Dorado, for appellant.

Ronald Lynn Griggs, El Dorado, for appellees.

RITA W. GRUBER, Judge.

Jeremy Hicks appeals from the order of the Union County Circuit Court appointing Norman Faith and Wong Duan Faith as guardians of the person and estate of their grandson, Logan Hicks, who was born on May 21, 1998. On appeal, Jeremy contends that the circuit court failed to comply with the statutory requirements for guardianship cases and that it failed to follow the supreme court's precedent set forth in *Devine v. Martens,*

371 Ark. 60, 263 S.W.3d 515 (2007). We affirm the circuit court's decision.

Logan's biological mother and the Faiths' daughter, Mary Hicks, died of a drug overdose on November 19, 2009. At the time of her death, Mary was married to and living with Jeremy, Logan's adoptive father, in the Faiths' backyard guesthouse. Logan spent his nights in the Faiths' home. This living arrangement had been in place for about eighteen months. After Mary's death, Jeremy moved into his parents' home with Logan.

On December 3, 2009, the Faiths filed a petition for appointment of guardianship over Logan. Jeremy responded, alleging that he was Logan's lawful surviving parent, that he objected to the appointment of guardians because it was not in Logan's best interest, and that Logan adamantly wished to remain in his custody.

At the hearing held on May 28, 2010, Jeremy testified that he and Logan were living with his parents, that he did not have a car, that he was unemployed from August 2009 until February 2010 when he worked about six weeks for his brother-in-law, and that he began working at Sears on April 28, 2010. He testified that up until Mary's death, the Faiths kept Logan at night. He also testified that he was not the primary caregiver and that the Faiths were good providers and bought Logan's food and clothing, took him to school, and attended parent/teacher conferences. He admitted that a pill cutter, spoons used to heat OxyContin, and needles were found in the guesthouse after Mary's death. A drug test was introduced indicating that Jeremy tested positive for morphine, hydrocodone, and oxycodone on March 23, 2010. The court ordered him to take another drug test on April 5, 2010, but he shaved all of the hair on his body before the test and the facility was unable to conduct the test because his hair was too

short. Finally, Jeremy testified that he had stopped taking drugs because he wanted to raise his son. He presented a drug test dated May 11, 2010, that indicated he was negative for all drugs. He presented another test, dated May 25, 2010, also indicating that he was negative for all drugs.

Amanda Faith Massey, Jeremy's sister-in-law, testified that Jeremy, a friend of Jeremy's, and Logan visited her in February 2010 and that Jeremy appeared intoxicated when he arrived. They left Amanda's children and Logan with a babysitter and went to a strip club. Amanda and her husband, B.J., returned home around 3:00 a.m., and Jeremy and his friend returned at 6:00 a.m., drunk and passed out. She testified that Jeremy had a lot of prescription pills including hydrocodone and Xanax. She said that they took the kids to Cici's Pizza later that day and that Jeremy passed out at the pizza parlor. She said B.J. asked Jeremy to leave their house and that Jeremy took Logan and left. She said Jeremy and his friend were still impaired when they left with Logan.

Appellee Norman Faith testified that he was a retired Air Force master sergeant and that he currently taught science and technology aviation at South Arkansas University. He said that he and his wife had been married for forty-one years. He testified that Mary and Jeremy did not pay rent while living in the guesthouse but that they sporadically paid the electric bill and water bill. He also testified that he suspected Mary and Jeremy were involved in drugs because several of their friends died of drug overdoses and he saw them under the influence of intoxicants on a regular basis.

He testified that Logan lived in his house while Mary and Jeremy lived in the guesthouse. According to Mr. Faith, his wife cared for Logan and did everything a

mother would do. He testified that his wife did not work and was available to care for Logan. She also played games with him. He testified that he was in charge of the school work. He testified that he never saw much interaction between Logan and Jeremy and that he did not believe Jeremy was a fit person to raise Logan because he did not think he could "turn over a leaf" as fast as he was claiming that he could. He said he had known Jeremy since 2002 and did not think the change was permanent. He also opined that the monthly social-security-benefit check of $1391 being provided to Logan because of his mother's death might have something to do with Jeremy's desire to raise Logan. He said that this was more than Jeremy earned at Sears.

The father of one of Jeremy's best friends testified that his son died in January 2010 of a drug overdose. He said that in the summer of 2008 he had seen Jeremy at the swimming pool with Logan and that Jeremy appeared to be under the influence of drugs.

Logan testified that he wanted to live with his dad because "he is a nice person." He also said the Faiths were nice people and Jeremy's parents were nice people. He testified that his dad had not changed but had been a "good person from the day one when I met him." He said he had never seen his dad "goofy" or "messed up." He disputed his aunt Amanda's testimony and denied that his dad passed out at the pizza parlor or acted drunk during their visit.

The trial court entered an order on August 18, 2010, granting the Faiths' petition and appointing them guardians of the person and estate of Logan. The court found that Jeremy and Mary were participants in the drug scene while living in the Faiths' guesthouse, that their drug use was regular and pervasive, that three of their friends had died of drug overdoses in addition to Mary, and that Jeremy abused his prescription medication and facilitated abuse by Mary and their friends. The court also credited the testimony of Amanda that Jeremy used drugs while in Logan's presence only three or four months before the hearing and found that Jeremy intentionally frustrated the court-ordered drug test by shaving his body hair. While the court recognized Jeremy's testimony that he was drug-free, employed, and supported by family in his interim care of Logan, the court was not convinced that the changed course of conduct was "of sufficient depth, duration and sincerity to warrant custody of the child." The court found that the Faiths were financially stable, owned a home appropriate for a child, and were experienced in child care, particularly with Logan. The court also found that the Faiths were Logan's primary caregivers while Mary and Jeremy lived in their guesthouse, were involved in Logan's school work and activities, and managed his daily routine. Finally, the court found it was in the best interest of Logan for the Faiths to be appointed his guardians. The court awarded unsupervised visitation to Jeremy pursuant to the guidelines. Jeremy filed this appeal.

We review probate proceedings de novo, but we will not reverse the decision of the court unless it is clearly erroneous. *Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000); *Amant v. Callahan*, 341 Ark. 857, 20 S.W.3d 896 (2000). When reviewing probate proceedings, we give due regard to the opportunity and superior position of the circuit judge to determine the credibility of the witnesses. *Id.*

Jeremy's first point on appeal is that the court did not comply with the requirements of Ark.Code Ann. § 28–65–218 (Repl.2004), which governs the award of temporary guardianships. Jeremy ar-

gues that the court order simply refers to a temporary guardianship and fails to find that there is imminent danger to the life or health of Logan and fails to limit the guardianship to ninety days, as the statute requires. We need not set forth the precise requirements under this statute because the Faiths did not petition for a temporary guardianship and the court did not appoint or attempt to appoint a temporary guardian. The word temporary never appears in the order. Section 28–65–218 is not applicable to this case.

Jeremy's second point on appeal is that the court erred in failing to use the appropriate standard in determining preference of a parent over a grandparent. Specifically, Jeremy refers to the supreme court's decision in *Devine v. Martens*, 371 Ark. 60, 263 S.W.3d 515 (2007), in which the supreme court reversed the circuit court's order granting the grandparents' petition for guardianship. Before we turn to *Devine*, we take time to set forth the law governing guardianships.

To appoint a guardian, the circuit court must be satisfied that (1) the person for whom a guardian is sought is either a minor or otherwise incapacitated; (2) a guardianship is desirable to protect the interests of the incapacitated person; and (3) the person to be appointed as guardian is qualified and suitable to act as such. Ark.Code Ann. § 28–65–210 (Repl.2004). *See also Smith v. Thomas*, 373 Ark. 427, 431, 284 S.W.3d 476, 479 (2008). Where the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. *Smith*, 373 Ark. at 432, 284 S.W.3d at 479. The Probate Code grants preferential status to the parents of a child, specifically providing that "[t]he parents of an unmarried minor, or either of them, if qualified and, in the opinion of the court, suitable, shall be preferred over all others for appointment

as guardian of the person." Ark.Code Ann. § 28–65–204(a) (Repl.2004). Our supreme court has clarified, however, that this preference is but one factor in determining who will be the most suitable guardian for the child and is subservient to the principle that the child's best interest is of paramount consideration. *Fletcher v. Scorza*, 2010 Ark. 64, at 12, 359 S.W.3d 413, 420–21; *Freeman v. Rushton*, 360 Ark. 445, 449, 202 S.W.3d 485, 486 (2005).

Jeremy contends that the circuit court did not apply the appropriate standard in determining parental preference in guardianship cases and cites *Devine* as the appropriate standard. In *Devine*, the supreme court held that the principle established in custody cases—that the law prefers a parent over a grandparent unless the parent is proved to be incompetent or unfit—applied in guardianship cases. *Devine*, 371 Ark. at 71, 263 S.W.3d at 523. The court agreed with Devine's argument that the circuit court erred in finding that she was an unfit parent due to environmental neglect, educational neglect, questionable moral guidance, and abandonment because she had taken "significant action toward rectifying" the offending conditions. *Id.* at 71–74, 263 S.W.3d at 524–26. The court compared the case to a dependency-neglect action and noted that these were the very types of improvements that parents are encouraged to make and that Devine should not be disparaged in her efforts to improve her home and her parenting skills. Jeremy points specifically to the following language in the court's opinion:

> This state's courts should not be in the business of permanently removing children from their parents' custody simply because the parents have exercised poor judgment in caring for their children. Just as the Arkansas Juvenile Code rec-

ognizes the efforts of parents in dependency-neglect actions to improve their homes and parenting skills, we should encourage and recognize such improvements by parents in guardianship actions. Frankly, it is not in a child's best interests to take custody from a natural parent who has rectified all issues related to his or her fitness, and grant custody to a third party, such as that child's grandparents.

*Id.* at 74–75, 263 S.W.3d at 526.

First, the supreme court overruled its holding in *Devine* to the extent that it held that the law prefers a parent over a grandparent unless the parent is proved to be unfit, specifically holding as follows: "To the extent that any of our prior cases suggest a standard of *fitness or unfitness* in guardianship proceedings involving the statutory natural-parent preference, we overrule them." *Fletcher*, 2010 Ark. 64, at 13, 359 S.W.3d at 421 (emphasis added). "[T]he sole considerations in determining guardianship pursuant to Ark.Code Ann. § 28–65–204(a) are whether the natural parent is qualified and suitable and what is in the child's best interest." *Id.* The principle in *Devine*, that a fit parent is preferred over a grandparent, is therefore not a factor in this case.

Moreover, Devine was the child's primary caregiver absent the nine-month period she agreed to allow the child to live with his grandparents. Further, the issues that needed correcting in *Devine*—a dirty home, fleas, excessive school absences, inappropriate wall art, and a morally questionable internet presence—were easily and quickly rectifiable. In this case, there was no evidence that Jeremy had ever served as Logan's primary caregiver and there was evidence that he had been abusing pain medication for years. While the court recognized Jeremy's testimony that, for several months before the trial, he had been clean of drugs, employed, and supported by family in his interim care of Logan, the court was not convinced that the changed course of conduct was "of sufficient depth, duration and sincerity to warrant custody of the child." We hold that the court's findings regarding whether Jeremy was qualified and suitable and what was in Logan's best interest are not clearly erroneous; therefore, we affirm the court's order.

Affirmed.

HART and MARTIN, JJ., agree.