2011 Ark. App. 535

**Donald LIGHT and Margaret E. Light, Appellants**

v.

**James DUVALL and Brenda Duvall, Appellees.**

**No. CA 10–1129.**

Court of Appeals of Arkansas.

Sept. 14, 2011.

Timothy Seth Irwin, Russellville, for appellees.

DOUG MARTIN, Judge.

Appellants Donald and Margaret Light appeal from the Yell County Circuit Court's order appointing appellees James and Brenda Duvall guardians of a minor child, A.J.D. The Lights, acting pro se, raise three points on appeal to this court: (1) they received ineffective assistance of counsel; (2) the trial court erred in finding that the Duvalls did not commit fraud with their original guardianship petition; (3) the trial court erred in denying their son's motion to vacate the Duvalls' original petition without considering the best interests of the child. We affirm.

Rickie Jean Duvall married Brian Light in March 2006, and they had a daughter, A.J.D., born on November 17, 2006. Brian was incarcerated,[1] and Rickie left the baby with her aunt and uncle, the Duvalls. Although Rickie and Brian filed for divorce, their divorce is still pending.

The Duvalls filed a petition for appointment of guardianship of A.J.D. on June 15, 2007, with Rickie's written consent. In the petition, the Duvalls listed the closest related persons to the minor child as Rickie and themselves, as the child's great-aunt and great-uncle. The trial court appointed the Duvalls guardians of A.J.D. on July 26, 2007.

On June 5, 2008, Brian filed a motion to intervene and motion to vacate the appointment of guardianship. The trial court granted Brian's motion to intervene.

On March 3, 2010, Brian's parents (A.J.D.'s grandparents), the Lights, petitioned for appointment of guardianship of the minor child, alleging that the current guardianship was improper, invalid, and void. The Lights alleged that the Duvalls' guardianship is ineffective due to fraud committed on the part of the Duvalls by not listing Brian as the child's father and the Lights as the child's paternal grandparents. Brian subsequently consented in writing to the Lights' guardianship of A.J.D.

On March 5, 2010, the Duvalls filed an amended petition for appointment of guardianship, in which they alleged that they were the de facto guardians for A.J.D., as she has been living with them since February 2007. The Duvalls listed Rickie, Brian, the Lights, and themselves as persons most closely related to the minor child. The petition, however, does not appear to have been served on anyone.

A hearing was held on July 13, 2010, at which the Duvalls and the Lights were present. Margaret Light testified that Rickie and Brian were married on March 24, 2006, and that the Duvalls attended the wedding. The guest book from the wedding ceremony and the marriage certificate were entered into evidence. Mar-

---

1. Brian was still incarcerated at the time the trial court entered the order from which his parents appeal.

garet further testified that A.J.D. was born on November 17, 2006, and that Rickie and Brian were still married but separated at the time. Margaret testified that she had minimal contact with A.J.D. after she was born because she could not locate Rickie and was not certain whether Rickie was staying with the Duvalls. She had assumed that Rickie had A.J.D. and that Brenda Duvall babysat the child. Margaret insisted that she did not know that A.J.D. was living with the Duvalls. According to Margaret, Brian rarely saw A.J.D. and, on occasions when he thought he would get visitation with the child, Rickie would call and say, "Never mind, my Aunt Brenda's got her." Margaret testified that she tried to talk with the Duvalls about visitation but that it was not a pleasant conversation. In fact, she said Brenda Duvall was actually rude and hung up the telephone on her and that, when she called back, James Duvall answered the telephone and was "vulgar," told her not to come near them, told her to "lose" their telephone number, and told her she would never see A.J.D. again. Margaret testified that it was after that telephone call that she learned a guardianship was in place and that no one had notified her of such beforehand. Margaret said that, before visitation was ordered by the court in December 2009, visitation with A.J.D. was difficult because of Brenda Duvall's "intense presence." According to Margaret, she and Brian did not go to the Duvalls' home to get A.J.D. because the Duvalls had threatened Brian and warned him not to come to their house.

Margaret further testified that she and her husband live in Havana, Arkansas, and that the town has a school system. She raises chickens for Tyson and can provide financially for A.J.D. Margaret described her visits with A.J.D. as "wonderful" but testified that she is concerned that A.J.D. does not recognize letters or numbers and lacks social skills. Margaret also testified that she is concerned in that A.J.D., at three years old, said during an argument with another grandchild, "All niggers should be dead."

Donald Light testified that he owns and operates D.J.'s Body Shop in Dardanelle, Arkansas, and raises cows and chickens with his wife on their farm. Donald stated that his income would provide for A.J.D. if he and Margaret were appointed as her guardians. He testified that he and his wife have a four-bedroom, three-bathroom house and that only he and his wife live there. Donald said that everything is in place to care for a three-year-old child, e.g., her own bed, toys, and material for learning. Donald testified that he and his wife would be better guardians for A.J.D. because they could provide for her "without a problem" and help her be more sociable with other children. On cross-examination, Donald opined that daycare could help with A.J.D.'s socialization. Donald testified that he is likewise concerned with A.J.D.'s ability to discern numbers and letters, count, and name colors.

Bennie James testified on behalf of the Lights. He said that he had known Brian and Margaret since 1995 and that he knew Donald since D.J.'s Body Shop moved next to his graphics store. Bennie testified that he had seen Margaret and Donald interact with their children and grandchildren and his own relatives and children and that they appear very caring and thoughtful of the children's needs. Bennie stated that he saw nothing that would cause him any concern if the Lights were appointed guardians of A.J.D.

Brenda Duvall testified that, at the time she filed the original petition for guardianship, she did not list Brian as the child's father because Rickie had told her

that A.J.D. was not Brian's child. Brenda stated that she told her attorney that Brian and Rickie were married when the child was born but that Rickie told her that they had since gotten a divorce. Brenda stated that she hired a lawyer to file a petition for guardianship and relied on the lawyer to handle the legal matters. Brenda testified that she went to school through the ninth grade and got her GED. Brenda testified that A.J.D. had been at the Duvalls' home "pretty much since she was born" but, specifically, from the time she was three months old. According to Brenda, Rickie did not know how to properly care for A.J.D. and had no home for the child. Brenda stated that A.J.D. calls her and her husband "mama" and "daddy" and said, "[A.J.D.]'s as much mine as she could be."

According to Brenda, she never kept Margaret Light from seeing A.J.D., but it "blew [her] away" when Margaret called to see A.J.D. because it was Brenda's understanding that, even if A.J.D. was Brian's child, the Lights wanted nothing to do with her. Brenda said she realized that, if the Lights were indeed A.J.D.'s grandparents, they should be able to see the child but that she was not going to simply let the Lights take A.J.D. without first getting to know them. Brenda testified that she has twenty-six nieces and nephews, thirty-three great-nieces and great-nephews, eight grandchildren, and numerous cousins, so A.J.D. "plays with all kinds of kids." She said that A.J.D. can count to fifteen, knows her colors, and can sing the whole alphabet song. Brenda testified that she and her husband enrolled A.J.D. in ABC Children's Academy and had planned to do that all along, even without the court order mandating it. Brenda testified that A.J.D. is "an extremely bright little girl" but that she will receive an assessment at ABC and, if there are any deficits in her

learning, the Duvalls will do everything they can to correct them.

Brenda further testified that she is a housewife and stays home to care for A.J.D. She said that the Duvalls have not had any financial difficulties caring for A.J.D. Brenda testified that she thought it was in A.J.D.'s best interest to stay with them because A.J.D. looks at them as her mother and father. She said the Duvalls have taken care of A.J.D. her entire life and that "[the child] doesn't know anything else."

Joyce Sanders, Brenda Duvall's sister, testified that she interacts with the Duvalls and A.J.D. at least once a week and that A.J.D. plays with her two grandchildren. Sanders stated that the Duvalls appear to have a parent-child relationship with A.J.D. She said that A.J.D. is "as smart as can be" and that she has no concerns about the child's development. Sanders also stated that she has full confidence in Brenda Duvall's ability to care for A.J.D.

James Duvall testified that he drives a truck for Lance Carrier Company in Morrilton, Arkansas, and that his average net pay is $1,000 to $1,200 per week. He said that his income allows for the Duvalls to adequately care for A.J.D. James stated that he and his wife have a three-bedroom, two-bathroom home, in which they live with A.J.D.

In ruling from the bench, the trial judge stated that both the Duvalls and the Lights would be good guardians for the child. The trial judge was concerned over A.J.D.'s use of "the 'N' word," but he recognized that children are like "sponges." The trial judge specifically found no fraud on the part of the Duvalls in filing their petition for guardianship. The trial judge found credible Brenda Duvall's testimony that she had told her lawyer the circumstances of A.J.D.'s birth and con-

cluded that the Duvalls' lawyer chose not to list Brian as A.J.D.'s father. The trial judge expressed concern about removing A.J.D. from the only home she had known. The trial judge noted that either Brian or the Lights should have stepped in much sooner but that, at that point, the relationship that had developed between the Duvalls and A.J.D. was such that it would be detrimental to take the child from the Duvalls' home. The trial judge stated that he would feel as comfortable putting A.J.D. with the Lights if "this had all evolved earlier" but that "it's a little late down the road." The trial judge encouraged the Duvalls and the Lights to communicate and cooperate with each other because they both love and want what is best for A.J.D.

In its "Order of Guardianship," the trial court denied Brian's motion to vacate the Duvalls' guardianship based on their original petition and specifically found no fraud on the part of the Duvalls. The trial court found that it was in A.J.D.'s best interest to appoint the Duvalls as her guardians, and the trial court left the standing order of visitation in place for the Lights.

■ The standard of review in probate proceedings, which include guardianships, is well settled:

> We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses.

*Smith v. Thomas,* 373 Ark. 427, 431, 284 S.W.3d 476, 479 (2008) (citing *Devine v. Martens,* 371 Ark. 60, 65, 263 S.W.3d 515,

519 (2007)). Pro se appellants receive no special consideration of their argument and are held to the same standard as a licensed attorney. *Hayes v. Otto,* 2009 Ark. App. 654, 344 S.W.3d 689.

■ Arkansas Code Annotated section 28–65–210 (Repl.2004) provides that, before appointing a guardian, the court must be satisfied that (1) the person for whom a guardian is prayed is either a minor or otherwise incapacitated; (2) a guardianship is desirable to protect the interests of the incapacitated person; and (3) the person to be appointed guardian is qualified and suitable to act as such. When the incapacitated person is a minor, the key factor in determining guardianship is the best interest of the child. *Devine, supra.*

■ We must first address an issue in the Lights' second point on appeal because it is a matter involving jurisdiction. *Mountain Pure, LLC v. Little Rock Wastewater Util.,* 2011 Ark. 258, 383 S.W.3d 347. "We have made it clear that subject-matter jurisdiction is always open, cannot be waived, can be questioned for the first time on appeal, and can even be raised by this court." *Pederson v. Stracener,* 354 Ark. 716, 719, 128 S.W.3d 818, 819 (2003). In their reply brief, the Lights maintain that, because the Duvalls' petitions were void ab initio, their (the Lights') petition was the only proper petition before the court and that the court therefore lacked jurisdiction to entertain the Duvalls' petitions. The probate court has jurisdiction to decide guardianship matters. Before Amendment 80, Ark.Code Ann. § 28–65–107 (1987) provided that "jurisdiction of the probate court of all matters of guardianship ... shall be exclusive." The statute was amended in 2003 and now provides that jurisdiction over guardianships is in circuit court. Ark.Code Ann. § 28–65–107 (Supp.2011); *see also Estates of McKnight*

*v. Bank of America, N.A.,* 372 Ark. 376, 277 S.W.3d 173 (2008). The trial court's "Order of Guardianship" was entered in the probate division of the circuit court of Yell County; thus, the trial court had jurisdiction to consider this guardianship matter.

■ In their first point on appeal, the Lights argue that they received ineffective assistance of counsel at the guardianship proceeding. The Lights contend that their trial counsel did not properly raise objections and failed to research the law. The Lights, however, did not argue their ineffective-assistance-of-counsel claim below, and in any event, a Sixth Amendment right to counsel is not cognizable in ordinary civil cases. *See Tucker v. State,* 311 Ark. 446, 844 S.W.2d 335 (1993).

■ Next, the Lights argue that the trial court erred in finding no fraud with respect to the Duvalls' original petition for guardianship because Brenda Duvall admitted that she knew Brian and Rickie were married at the time of A.J.D.'s birth. Arkansas Code Annotated section 28–65–205(b)(6) (Repl.2004) states that a petition for guardianship shall include, insofar as can be ascertained, the names and addresses of the persons most closely related to the incapacitated person by blood or marriage. The Lights' point with respect to fraud, however, stems from an argument raised by Brian in his motion to vacate the order appointing the Duvalls guardians over A.J.D. The Lights do not have standing to argue that the trial court erred in denying Brian's motion to vacate. The general rule regarding standing is "that an appellate court cannot act upon an appeal taken by one not a party to the action below." *See Ark. Dep't of Human Servs. v. Bailey,* 318 Ark. 374, 377, 885 S.W.2d 677, 679 (1994). Brian was the only person with standing to appeal the trial court's denial of his motion to vacate,

and he did not appeal that ruling. *See, e.g., Seymour v. Biehslich,* 371 Ark. 359, 266 S.W.3d 722 (2007).

In the Lights' reply brief, Margaret Light states that she has power of attorney for Brian and, therefore, she does have standing to argue on his behalf. The Lights, however, did not include this power of attorney in their addendum, and, in any event, Margaret Light did not bring suit in her capacity as Brian's power of attorney. The "Motion to Vacate" was brought by Brian Light and not by Margaret Light acting as his power of attorney, and the Lights' petition for appointment was brought in their names alone. Therefore, to the extent the Lights are attempting to appeal the denial of Brian's motion to vacate, they lack standing.

Also contained within their second point on appeal is the Lights' contention that they were deprived of due process in that the Duvalls did not perfect service of their guardianship petition on either them nor Brian. Again, the Lights do not have standing to contest the lack of service on Brian's behalf. Regardless, even constitutional arguments cannot be raised for the first time on appeal. *Collins v. State,* 308 Ark. 536, 826 S.W.2d 231 (1992). Although the Lights' attorney raised the lack-of-service issue at the hearing, sans the due-process argument, the Lights did not obtain a ruling from the trial court, which operates as a waiver of this argument on appeal. *See Morgan v. Chandler,* 367 Ark. 430, 241 S.W.3d 224 (2006); *see also Ark. Wildlife Fed'n v. Ark. Soil & Water Conservation Comm'n,* 366 Ark. 50, 233 S.W.3d 615 (2006) (holding that when an appellant fails to obtain a ruling on an issue from the circuit court, his or her argument is not preserved for appeal because there is no decision of the circuit court for this court to review).

In addition, Arkansas Code Annotated section 28–65–207(a)(3) (Repl.2004) provides that notice need not be given to any person who actually appears at the hearing. The Lights were present at the hearing on July 13, 2010, at which the trial court heard both the Lights' petition and the Duvalls' amended petition. Although it appears that the Lights were not served with the Duvalls' amended petition, they were present at the hearing such that notice was not necessary.

The Lights argue that Brian consented to their petition for guardianship but did not consent to the guardianship that was improperly obtained by the Duvalls. According to the Lights, the trial court ignored Brian's "parental preference" that they be appointed guardians of A.J.D. The Lights rely on Arkansas Code Annotated section 28–65–204(b) (Repl.2004), which provides that the court shall appoint as guardian the one most suitable who is willing to serve, giving due regard to any request contained in a will or other written instrument executed by the parent of a minor child and the relationship by blood or marriage to the person for whom guardianship is sought. Ark.Code Ann. § 28–65–204(b)(1) and (4).

The Lights suggest that Brian was the sole parent left to give his "preference" that the Lights be appointed guardians of A.J.D. While the Lights repeatedly assert that Rickie "relinquished her parental rights," the language of the consent document to which the Lights specifically refer states that Rickie waived her right to "notice of and participation in any operation of the custodians or their agents which may relate to the juvenile." This language does not extinguish Rickie's parental rights to A.J.D. We note that Brian likewise waived notice of the proceedings. Indeed, both Rickie and Brian simply consented to the guardianship of the Duvalls

and the Lights, respectively. There is no evidence whatsoever that the trial court ignored Brian's wishes. If the Lights wanted clarity on that issue, they should have requested specific findings pursuant to Ark. R. Civ. P. 52(a) (2011).

The Lights further contend that the Duvalls are clearly not suitable guardians for A.J.D. because they perjured themselves in their verified petition. When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses. *Smith, supra.* The trial court specifically found that the Duvalls did not commit fraud with their petition and believed Brenda Duvall's testimony regarding the circumstances surrounding the drafting of the petition. Therefore, there was no perjury to render the Duvalls unsuitable guardians.

According to the Lights, the trial court should not have relied on the length of time A.J.D. resided with the Duvalls to influence its decision because they claim that the extended period was due to constant delays in the proceedings. The Lights themselves, however, took no action to be appointed guardians until March 2010, when A.J.D. was over three years old. The trial judge was entitled to consider, and indeed would have been remiss if he did not consider, the fact that A.J.D. had lived with the Duvalls for practically her entire life. In *Smith, supra,* our supreme court on a petition for review held that, although the child's natural father petitioned for guardianship, it was in the then nine-year-old child's best interest to remain with his maternal grandparents. Although it is a termination-of-guardianship case, our supreme court noted: "The circuit court weighed the evidence and found that it was in B.S.'s best interest to remain with the Thomases, with whom B.S. had lived for virtually all of his

life and who had provided a caring and stable home for B.S." *Smith*, 373 Ark. at 434, 284 S.W.3d at 481. When a guardianship has been in place for a period of time, the stability of the child's environment and how well the child is functioning in that environment are factors to consider in determining what is in the best interest of the child. The trial court properly considered the fact that A.J.D. had lived with the Duvalls for essentially her entire life and found that she was functioning well in that environment. There was no abuse of discretion in considering these factors and concluding that it was in A.J.D.'s best interest to remain with the Duvalls under their guardianship.

Affirmed.

WYNNE and HOOFMAN, JJ., agree.