# IN THE SUPREME COURT OF TEXAS

No. 17-0850

KMS RETAIL ROWLETT, LP
F/K/A KMS RETAIL HUNTSVILLE, LP, PETITIONER

v.

CITY OF ROWLETT, TEXAS, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued October 31, 2018**

JUSTICE BROWN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BUSBY joined.

JUSTICE BLACKLOCK filed a dissenting opinion, in which JUSTICE LEHRMANN and JUSTICE BOYD joined.

The City of Rowlett exercised its eminent-domain authority to take KMS's private-road easement and convert it to a public road connecting several commercial retail and restaurant sites. Pointing to the taking's relationship to an economic-incentives deal that would secure a Sprouts Farmers Market grocery store for the city, KMS argues the taking violates both the Texas Constitution's public-use requirement as well as chapter 2206 of the Government Code, which prohibits takings for economic-development purposes. KMS further urges that the taking should be invalidated because it was fraudulent, in bad faith, and arbitrary and capricious.

The trial court below granted partial summary judgment in the city's favor and denied KMS's motion for summary judgment altogether. The court of appeals affirmed. We agree with the court of appeals that (1) chapter 2206 does not apply here; (2) the taking was necessary for a constitutional public use; and (3) KMS failed to raise a fact issue precluding summary judgment. Accordingly, we affirm.

## I

KMS Retail Rowlett, LP, is a commercial-real-estate developer. It owns a triangle-shaped nine-acre tract in the City of Rowlett that is part of a commercial subdivision called Luke's Landing. The tract is bordered to the west-northwest by Kenwood Drive; to the south by Lakeview Parkway; and to the east-northeast by a twelve-acre tract owned by Briarwood Armstrong, LLC, also a commercial-real-estate developer.

Though much of the KMS tract remains undeveloped, four commercial sites were built along the southern boundary with primary access from Lakeview Parkway. At the time of the condemnation proceeding at issue, those sites were occupied by a Wells Fargo bank, a Starbucks, a Chick-fil-A, and an Arby's. As part of its limited development of the tract, KMS built a private drive that allows access to these four sites from the west-northwest via Kenwood Drive. Located at a stoplight on Kenwood Drive, the private drive allowed traffic to access the four commercial sites from the rear. The drive extended the length of the four commercial sites, but no farther, leaving a stretch of vacant land between the edge of the four sites and the border with the Briarwood tract to the east.

The entrance to KMS's private drive was positioned across a Walmart parking-lot entrance on the other side of Kenwood Drive. Accordingly, customers leaving Walmart's parking lot could

2

reach KMS's commercial sites from the rear by proceeding straight through a stoplight at Kenwood Drive. Without the private drive, the most efficient route to reach those sites from Walmart would be to travel south-southwest along Kenwood Drive, turn left onto Lakeview Parkway, and then turn left into the businesses' front-facing parking-lot entrances. A not-to-scale map of Luke's Landing and its surrounding properties and roadways is appended to this opinion.

The record reflects that as early as 2012, the city undertook efforts to recruit a high-quality grocery store. City representatives approached Sprouts Farmers Market and discovered mutual interest in a Rowlett location. Sprouts began negotiating with Briarwood to execute a long-term lease under which Sprouts could build a store on the Briarwood tract. In 2014, Briarwood asked the city about the possibility of an economic-incentives deal to facilitate negotiations with Sprouts. The city and Briarwood fleshed out a deal that largely centered on tax breaks but also required Briarwood to build a "private circulation drive providing for cross-access between adjacent properties." The "private circulation drive" would connect KMS's existing private drive to the commercial development on Briarwood's property. With the private drive extended to reach the Briarwood tract, Sprouts would benefit from cross-access traffic from the west via Kenwood Drive. In exchange, the city agreed to pay Briarwood $225,000, roughly half the projected cost of extending the private drive.

This case is about the city's eventual decision to condemn the land necessary to extend the private drive to connect the KMS and Briarwood tracts. The economic-incentives deal is silent on whether Briarwood had an existing legal right to extend the private drive. KMS argues that Briarwood and the city colluded to have the city condemn what Briarwood could not acquire on its own after Briarwood learned it had no easement allowing it to extend the private drive and

3

failed to negotiate purchase of the necessary land. Accordingly, KMS insists the city impermissibly condemned its property solely to benefit a private entity. KMS points to Briarwood's lease with Sprouts, which provides for reduced lease payments to Briarwood if the cross-access drive isn't built, as Briarwood's motivation for enlisting the city to condemn KMS's easement.

Cross-access between the tracts is mentioned in the city's earliest documentation in the record regarding the Sprouts deal. A PowerPoint presentation dated July 2014 that was prepared for elected officials acknowledges the "potential need for condemnation" to provide cross-access. The anticipated private-road extension appears in schematics and an internal city memo regarding preliminary plat approval of the Sprouts development. And it is mentioned in every version of the draft economic-incentives deal that appears in the record along with the city's payment to Briarwood in exchange for building it.

The earliest indication in the record that Briarwood would have trouble extending the drive appears in a September 2014 email in which Briarwood's title insurer communicated that it found no legal avenue for Briarwood to build on KMS's tract. That finding had an immediate impact on the still unapproved economic-incentives deal between the city and Briarwood. On October 1, a city staffer emailed the city council, stating, "I wanted to make sure you know that we have pulled the agenda item on the Sprouts deal from the October 7th council meeting. . . . To be clear, the parties are good to go with the proposed development agreement. However, the issue has to do with the wording on the plat of the [KMS tract] and the connection of the road that is proposed to be built between the two properties."

The evidence suggests Briarwood offered to purchase an easement to extend the private drive and that Briarwood rejected a counter-offer from KMS. In an email, a Briarwood

4

representative stated, "We have decided our best way forward on this situation is to convince our tenant to do this deal without the bridge and without direct access to Kenwood [D]rive." But that same month, the city's attorney emailed a city staffer directing him to use an attached easement-deed form to "get as many voluntary dedications as possible" and then "get someone to prepare a full-blown legal for the part of the roadway that sits on the [KMS] tract and for anyone who doesn't voluntarily sign the deed. Then . . . get an appraisal and get the acquisition process underway."

The economic-incentives deal was back on the city-council agenda in November, and the terms regarding the cross-access drive in the executed version of the agreement were unchanged from previously circulated drafts. On January 16, however, Briarwood and the city executed a letter amendment to the economic-incentives deal that modified the terms of the city's payment to Briarwood for construction of the cross-access drive. It provided that the $225,000 payment "may, however, be reduced in accordance with right-of-way acquisition costs incurred by the City (to include payments made to property owners, ROW acquisition agents, and direct costs incurred to acquire rights-of-way) to convert the existing private easement on the adjacent properties in the Luke's Landing subdivision/addition to a public street or roadway. Such reduction shall not exceed $62,750 without [Briarwood's] approval."

The city filed its original petition in eminent domain in March 2015. As evidence of collusion between Briarwood and the city, KMS points out that a boundary survey attached to the petition was prepared by the same engineering firm Briarwood hired to prepare its preliminary plat and development plan. KMS further insists, and the city has not disputed, that Briarwood paid for the survey included with the eminent-domain petition.

Over KMS's objections, a panel of special commissioners awarded KMS $31,662 for the taking. After KMS moved to dismiss the eminent-domain action, the city and KMS filed competing motions for summary judgment regarding the permissibility of the city's taking. KMS argued in its motion that the taking violated Government Code chapter 2206 and was not for a constitutional public use. KMS further argued that the city's public use and necessity findings were fraudulent, in bad faith, and arbitrary and capricious. The trial court denied KMS's motion. It also granted the city's motion for summary judgment in part, issued a final judgment confirming the commissioners' award, and dismissed all of KMS's claims with prejudice.

The court of appeals affirmed, holding the summary-judgment evidence established that the city's condemnation was necessary for a public use and that KMS failed to raise a fact issue as to whether the taking was fraudulent, in bad faith, or arbitrary and capricious. 559 S.W.3d 192 (Tex. App.—Dallas 2017). It further held chapter 2206 of the Government Code inapplicable to the taking because an exception provides that the statute "does not affect the authority of an entity authorized by law to take private property through the use of eminent domain for . . . transportation projects, including, but not limited to . . . public roads or highways." *Id.* at 203 (citing TEX. GOV'T CODE § 2206.001(c)(1)). We granted KMS's petition for review.

**II**

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Both KMS and the city moved for summary judgment on traditional and no-

6

evidence grounds. To prevail on a traditional summary-judgment motion, a movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). To defeat a no-evidence motion, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary-judgment evidence and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). But when parties move for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *Lighting Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

### *Takings must be "necessary" for a "public use"*

Under the Texas Constitution, property may be condemned only for a public use and only so long as the owner is justly compensated. TEX. CONST. art. I, § 17 ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ."). The Local Government Code additionally requires that a taking be *necessary* for a public use: "When the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public use to acquire public or private property . . . ." TEX. LOC. GOV'T CODE § 251.001(a). In short, these provisions require the municipality to

7

demonstrate: (1) it intends to put the property to public use (the public-use requirement); and (2) the condemnation is necessary to advance or achieve that public use (the necessity requirement). *City of Austin v. Whittington*, 384 S.W.3d 766, 772 (Tex. 2012). KMS primarily argues that the city's taking was not for a public use but also contends it was unnecessary to achieve a public use.

### *Additional limitations in Government Code chapter 2206*

In 2005, the United States Supreme Court held in *Kelo v. City of New London* that the public-use requirement imposed by the Fifth Amendment to the United States Constitution was not violated when a city condemned a private home as part of an economic-redevelopment plan that would turn the land over to a private business. *See generally* 545 U.S. 469 (2005). In a special-called session later that year, the Texas legislature enacted Government Code chapter 2206, which placed new statutory limits on governmental entities' eminent-domain authority. Act of Aug. 16, 2005, 79th Leg., 2d C.S., ch. 1, § 1, 2005 Tex. Gen. Laws 1, 1–2. Specifically, chapter 2206 prohibits a taking that (1) "confers a private benefit on a particular private party through the use of the property", (2) "is for a public use that is merely a pretext to confer a private benefit on a particular private party", (3) is for "economic development purposes", or (4) "is not for a public use." TEX. GOV'T CODE § 2206.001(b)(1)–(4). These limitations were considered a swift legislative response to *Kelo. See W. Seafood Co. v. United States*, 202 F. App'x 670, 677 (5th Cir. 2006) (noting that chapter 2206 was passed in response to the *Kelo* decision); *see also Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 813 (Tex. 2016) (Lehrmann, J., concurring) (noting that chapter 2206 "has widely been viewed as a response to *Kelo*").

## III

## A

### *This taking is exempt from Government Code chapter 2206*

KMS argues that because the "new public use definitions in Section 2206.001(b) are entitled to judicial deference," the legislature's enactment of chapter 2206 "altered" our public-use jurisprudence. Specifically, KMS contends we should more narrowly construe constitutional "public use" in light of the legislature's statutory winnowing of permissible takings. We therefore first consider the applicability of chapter 2206 to the facts before us.

Whether a taking is for a constitutional public use is a question ultimately decided by the courts, but we have previously stated that a legislative declaration on public use is entitled to our deference. *See Whittington*, 384 S.W.3d at 777; *Hous. Auth. of City of Dall. v. Higginbotham*, 143 S.W.2d 79, 83 (Tex. 1940) ("[W]here the legislature has declared a certain thing to be for a public use, such declaration of the legislature must be given weight by the courts."). Of course, chapter 2206 does not purport to declare a public use. At most, it declares what is *not* a public use. But assuming chapter 2206 should nonetheless receive the deference our precedent contemplates, we must first decide whether chapter 2206 applies at all to *this* taking. The city argues, and the court of appeals held, it does not. We agree.

KMS argues that the city's taking violates all four of the prohibitions found in section 2206.001(b). The city's only response is that chapter 2206 includes an exception that applies to this taking: "This section does not affect the authority of an entity authorized by law to take private property through the use of eminent domain for . . . transportation projects, including, but not

9

limited to, railroads, airports, or *public roads* or highways . . . ." TEX. GOV'T CODE § 2206.001(c)(1) (emphasis added).

KMS's easement was indisputably taken to facilitate construction of a public road. KMS, however, contends the taking was not for a *legitimate* transportation project. The cross-access drive is inextricably linked, KMS argues, to the economic-incentives agreement between Briarwood and the city. So, KMS continues, it falls squarely under the type of taking the legislature sought to prohibit. *See id.* § 2206.001(b)(1)–(4). KMS particularly emphasizes subsection (b)(2), which prohibits a taking "for a public use that is merely a pretext to confer a private benefit on a particular private party." KMS insists the city's stated reasons for taking its property—that it was needed to facilitate cross-access, alleviate traffic, and provide first-responder access—were merely pretexts for the city's actual motivation: to provide a private benefit to Briarwood and Sprouts that would help close their deal and bring a Sprouts store to the city.

The court of appeals noted our pronouncement in *City of Austin v. Whittington* that the prohibitions found in section 2206.001(b) "would not invalidate a taking for a purpose that falls within one of the statutory exceptions listed in section 2206.001(c)." 559 S.W.3d at 203 (citing *Whittington*, 384 S.W.3d at 791). It then rejected KMS's argument that the taking is not a *legitimate* transportation project, reasoning that there is no statutory language "on which to add an exception to the application of subsection (c) if a transportation project is illegitimate or a requirement of legitimacy." *Id*. In that court's view, a determination that the taking is for a "transportation project"—specifically, a "public road"—renders section 2206 inoperative, ulterior motives notwithstanding.

On appeal to this Court, KMS argues that the court of appeals failed to reconcile subsections (b) and (c) in a manner that would give effect to both provisions. KMS also contends that probing the legitimacy of a taking for a "transportation project" does not impermissibly add to the statute's text. KMS further insists legislative history supports its position. Finally, KMS argues that this taking is not for a "transportation project" as defined by the Transportation Code, nor is it a "public road" under the city's own ordinances and standards.

When interpreting statutes, we look to the plain meaning of the enacted text. "We must enforce the statute 'as written' and 'refrain from rewriting text that lawmakers chose.'" *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009)). We do not "resort to extrinsic aids, such as legislative history, to interpret a statute that is clear and unambiguous." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). Rather, we limit our analysis to the words of the statute and apply the plain meaning of those words "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). In doing so, we use definitions the legislature has prescribed and take into account any technical or particular meaning the words have acquired. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) (citing TEX. GOV'T CODE § 311.011(b)). While we must consider the specific statutory language at issue, we must do so while looking to the statute as a whole, rather than as "isolated provisions." *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

### The relationship between subsections (b) and (c)

We first address the relationship between subsections (b) and (c) and then turn to the meaning of "transportation project" and "public road."

Section 2206.001 is titled "LIMITATION ON EMINENT DOMAIN FOR PRIVATE PARTIES OR ECONOMIC DEVELOPMENT PURPOSES." Subsection (b) provides that "[a] governmental or private entity may not take private property through the use of eminent domain" if the taking falls under one of four scenarios. TEX. GOV'T CODE § 2206.001(b)(1)–(4). And subsection (c) states that "[t]his section does not affect the authority of an entity authorized by law to take private property through the use of eminent domain for . . . transportation projects, including, but not limited to, railroads, airports, or public roads or highways." *Id.* § 2206.001(c)(1).

Overall, section 2206.001 is a self-styled limitation on the exercise of eminent domain. In all instances, the source of a governmental or private entity's authority to exercise eminent domain in the first place is found and defined outside of chapter 2206. That authority—whatever it is—is plainly limited by section 2206.001(b). But subsection (c) states that section 2206.001 "does not affect the authority of an entity authorized by law to take private property through the use of eminent domain" for a list of specific uses, including "transportation projects," which is further defined to specifically include "public roads." *Id.* We cannot read subsection (c) as anything other than a clear-cut exception to the limitations imposed by subsection (b). Chapter 2206 proclaims it "does not affect the authority" of a condemnor pursuing a transportation project—authority prescribed elsewhere in statute. Accordingly, if a taking is for a transportation project, the condemnor is constrained only by the statutory provisions that grant it condemnation authority

12

(and any other relevant statutes) and the limitations imposed by the constitution and our case law. The condemnor is free of the additional limitations imposed by section 2206.001(b).

KMS essentially argues that reading subsection (c) as an outright exception undermines the protections afforded by subsection (b). For example, condemnors could skirt the prohibition against takings for a public use that is "merely a pretext to confer a private benefit on a particular private party" simply by declaring the taking is for a "transportation project." *See* TEX. GOV'T CODE § 2206.001(b)(2), (c)(1). KMS's point is well-taken, but sometimes that is how exceptions work, whether inadvertently or by design. The simplest explanation for the exception is that the legislature sought to provide greater statutory limitations on takings for "economic development purposes" that were the subject of the *Kelo* decision while maintaining the status quo for more traditional takings purposes. *See* TEX. GOV'T CODE § 2206.001(c)(1)–(11) (exempting section 2206's applicability to takings for "water supply, wastewater, flood control, and drainage projects"; "public buildings, hospitals, and parks"; "utility services"; and "a library, museum, or related facility"; among others).

Moreover, KMS's reading of the statute would negate subsection (c) in *all* applications. If a taking for what is indisputably a public road, park, or library can always be scrutinized for whether it was a pretext to confer a private benefit under subsection (b)(2), then subsection (c) has no real operation. Our interpretation of a statute should "giv[e] effect to every word, clause, and sentence." *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013); *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016) ("[W]e consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage."). Subsection (c) must

13

limit subsection (b)'s applicability somehow. But under KMS's construction it is no limitation at all.

This is not to say that landowners whose property is taken for a public use falling under subsection (c) have no recourse. It is simply not found in chapter 2206. Limitations on a condemnor's authority to exercise eminent domain may nonetheless be found in the statutory source of that authority. Moreover, our case law interpreting and applying the constitution's public-use requirement provides that a condemnee may seek to invalidate a taking for public use on a showing that the taking was fraudulent, in bad faith, or arbitrary and capricious. *See Whittington*, 384 S.W.3d at 777–78. Indeed, KMS has done so in this case—it makes the same pretext arguments in support of its position that the taking should be invalidated under our public-use jurisprudence.

### *"Transportation project" and "public road"*

KMS additionally argues that this taking is not actually a "transportation project" for a "public road." If KMS is correct, section 2206's limitations would apply. KMS relies on a definition of "transportation project" found in the Transportation Code that would exclude this taking. And KMS further argues that the taking is insufficient to accommodate a public-access drive under the city's own ordinances, thus negating the city's position that the taking is for a "public road." We address these points in turn.

The Regional Mobility Authority Act was enacted in 2003 and codified as chapter 370 of the Transportation Code. It authorizes the "creation of a regional mobility authority for the purposes of constructing, maintaining, and operating transportation projects." TEX. TRANSP. CODE § 370.031(a). Chapter 370 does not provide a general definition of "transportation project." Rather,

14

in a section titled "DEFINITIONS," it sets forth a list of seventeen manifestations of a "transportation project" for purposes of the Regional Mobility Authority Act. *Id.* § 370.003(14)(A)–(P). Importantly, section 370.003 states that the definitions provided therein apply "[i]n this chapter." *Id.* § 370.003.

Nonetheless, KMS argues that we should employ the definition of "transportation project" in Transportation Code section 370.003 here, reasoning that "legislative enactments that concern a similar subject matter and also possess the same general purpose" should be considered together. If we agree, KMS further argues that the only public road that qualifies as a "transportation project" under chapter 370 is one with "a functional classification greater than a local road or rural minor collector." *Id.* § 370.003(14)(D). The city does not argue the cross-access drive at issue here would meet that definition.

We are unpersuaded. Although we sometimes consider a term's usage "in other statutes, court decisions, and similar authorities," *see Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017), we disagree with KMS that Government Code chapter 2206 and Transportation Code chapter 370 "concern a similar subject matter and also possess the same general purposes." Although both statutes employ the term "transportation projects," the statutes themselves are unrelated. Government Code chapter 2206 imposes limitations on the exercise of eminent-domain authority and addresses "transportation projects" only to define an exception to the statute's applicability. *See* TEX. GOV'T CODE § 2206.001(c)(1). Transportation Code chapter 370 addresses the creation and governance of localized regional-mobility authorities and defines "transportation project" for the limited purposes of delineating the types of projects it authorizes those authorities to undertake. *See* TEX.

TRANSP. CODE § 370.031(a). Chapter 370 makes no effort to generally define "transportation project" outside the context of its limited subject matter. *See id.* § 370.003 (setting forth definitions that are applicable "[i]n this chapter"). And a public road qualifies as a "transportation project" under chapter 370 only if it carries a "functional classification greater than a local road or rural minor collector"—a definition that presumably excludes much of what would ordinarily be considered "public roads." *Id.* § 370.003(14)(D). This narrow definition makes sense as a limitation on the authority regional-mobility authorities enjoy but has little use outside that context. Applying it in Government Code section 2206.001(c) would make subsection (c)'s applicability turn not on the legislature's determination of how eminent-domain authority should be exercised but on its unrelated judgment about what projects a regional-mobility authority may undertake.

Although "transportation projects" under Government Code section 2206.001 is undefined, the examples offered—"including, but not limited to, railroads, airports, or public roads or highways"—are a better guide for assigning meaning. In these examples, we find broad references to some of the most conventional—and less controversial—justifications for the exercise of eminent-domain authority. And there is no need here to further define "transportation project" for purposes of section 2206.001 because "public road" is already given as an example. Rowlett's city council passed a formal resolution authorizing the acquisition of KMS's private-road easement "for the public purposes of acquiring right of way for construction, maintenance and operation of a public street." Whatever else might be considered a "transportation project" under subsection (c), this taking falls neatly into the statute's express reference to a "public road."

KMS argues, however, that this taking is not for a "public road" because the cross-access drive does not meet the city's own standards for construction of a public street. Specifically, KMS

points out that the easement is not wide enough to meet the standards imposed by the city's Master Thoroughfare Plan. The city maintains the dimensions of the cross-access drive are compliant with city ordinances. But even if KMS's interpretation of the ordinances is correct, we would still consider the taking to be for a "public road" for purposes of chapter 2206. We have no basis to conclude that a city street is any less a "public road" under subsection (c) simply because it does not comply with the city's own ordinances. Even if the city knowingly deviated from its standards for reasons specific to the project at hand, KMS makes no argument that the roadway at issue is not open to the public. Nor do we find intent in section 2206.001 for the meaning of "public road" to vary according to standards set by local government entities. For purposes of subsection (c), "public road" has one common, ordinary meaning. It does not take on an untold number of permutations depending on any one of thousands of technical definitions that might be supplied by a local government's ordinances or design plans.

We agree with the court of appeals that chapter 2206 is inapplicable to this taking. Because we so hold, we need not further consider KMS's arguments that chapter 2206 should "alter" our jurisprudence on constitutional public use. To the extent the legislature's determinations regarding "public use" in chapter 2206 are due our deference, that same statute has disavowed its applicability to this taking. Accordingly, we proceed to consider the taking's constitutionality without reference to chapter 2206.

**B**

### *The taking was necessary for a constitutional public use*

A city may take private property when it determines the property is necessary for a public use so long as it provides just compensation to the property owner. *See Whittington*, 384 S.W.3d

17

at 772. To establish a valid exercise of eminent domain, a municipality must show it intends to put the property to public use and that the condemnation is necessary to advance or achieve that public use. *See id.* Property is taken for public use only when "there results to the public some definite right or use in the business or undertaking to which the property is devoted." *See Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 833 (Tex. 1958). "It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it." *See Hous. Auth. of City of Dallas v. Higginbotham*, 143 S.W.2d 79, 83, 84 (Tex. 1940). Similarly, the mere fact that a particular individual, group, or enterprise may benefit will not deprive the use of its public character. *See id.* This Court has, however, invalidated takings that conferred only a private benefit on a private party. *See Maher v. Lasater*, 354 S.W.2d 923 (Tex. 1962); *Phillips v. Naumann*, 275 S.W.2d 464 (Tex. 1955).

We clarified the scope of judicial review applicable to condemnation cases in *City of Austin v. Whittington*. *See* 384 S.W.3d at 777–78. Although the courts ultimately decide what a public use is, a legislative declaration on public use is entitled to our deference. *See id.*; *Higginbotham*, 143 S.W.2d at 83. This deference does not abrogate judicial review: "We have long held that 'the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts.'" *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012) (quoting *Maher*, 354 S.W.2d at 925). And we have clarified that "judicial review may nullify a taking where the condemnor's decision was fraudulent, in bad faith, or arbitrary and capricious." *Whittington*, 384 S.W.3d at 777 (citing *FKM P'ship, Ltd. v. Bd. of Regents of the Univ. of Houston Sys.*, 255 S.W.3d 619, 629 n.9 (Tex. 2008)). Accordingly, we must first decide

18

whether the city's taking is for a public use, granting due deference to legislative declarations to that effect. If the taking is for a public use, we proceed to consider KMS's arguments that the taking was nonetheless fraudulent, in bad faith, or arbitrary and capricious.

The court of appeals held that the evidence "established as a matter of law that the taking was necessary for a public use to provide cross-access, traffic circulation, and emergency vehicle access between retail centers that are traffic generators." 559 S.W.3d at 200. "Although the decision to convert KMS's private road easement to a public street may benefit Briarwood and [Sprouts]," the court of appeals continued, "it also benefits all the retail businesses that abut the private road easement as well as the retail establishments on Kenwood Drive." *Id.* Finally, the court of appeals reasoned that "it is immaterial whether the City wanted the public roadway to assist the development of the Briarwood tract so long as the public could benefit from or use the improvements and the improvements were not clearly and palpably private." *Id.*

In reaching its conclusion, the court of appeals relied on three pieces of evidence: First, a formal city-council resolution stating that "a public necessity exists for the welfare of the City and its citizens and it is in the public interest" to acquire KMS's private-road easement "for the public purpose of acquiring right of way for construction, maintenance and operation of a public street." *Id.* at 199. Second, a city staff report dated January 2015 explaining the condemnation would (1) permit Briarwood to construct a cross-access drive that would be a "city street and [serve] a public purpose by providing access from Kenwood Drive across the drainage channel to the Briarwood tract"; (2) facilitate construction of a cross-access drive that would "provide circulation between retail locations on the north side of Lakeview Parkway which will facilitate retail activity and will prevent increased traffic flow on Lakeview Parkway"; (3) provide "emergency vehicle

19

access and first responder service"; and (4) allow vehicles to access the Briarwood tract from Kenwood Drive, and vice versa, without traversing Lakeview Parkway.[1] *Id*. Third, the court of appeals considered deposition testimony from the city's director of economic development stating that the taking was necessary to provide cross-access between adjoining-property owners. *Id*.

The court of appeals correctly observed that no evidence in the record shows "that a public street in the easement would not provide circulation between retail locations on the north side of Lakeview Parkway, would not facilitate retail activity, and would not reduce increased traffic flow on Lakeview Parkway." *Id*. at 200. Significantly, KMS conceded at oral argument that this taking would be for a public use were it not done at Briarwood's behest to attain a private benefit.[2] But this is at best an argument that the taking was fraudulent; it is no argument that the purported justification for the taking did not constitute a public use. We are therefore not presented with any basis on which to disagree with the court of appeals' conclusion that "[t]raffic circulation and cross-access between retail areas is a public purpose." *Id.* at 199. The evidence the court of appeals considered establishes that the taking was for a public use.

---

[1] KMS argues the court of appeals should not have relied on the staff report because there is "no evidence that the document . . . was ever presented to the city council, much less at the time of the condemnation resolution vote." We agree that the staff report should not receive the deference to which a legislative declaration on public use is entitled but conclude it is nonetheless probative evidence of the city's reasons for the taking.

[2] "I think the context is for a public transportation project if it's to implement for example, cities have thoroughfare plans as part of their comprehensive planning process where they look at all the needs of the city, where the, you know, where cars go, their timing, congestion. If it's to condemn it—a, a road is part of the thoroughfare plan, it, it would be difficult to argue that's not for a public use and a public purpose [be]cause it's not being initiated by a particular property owner. I think the, the distinction is here is, if the condemnation's primary purpose is to—is that a request of a private property owner to benefit a private property owner, I think that puts it into the private use category." Transcript of Oral Argument at 4, *KMS Retail Grp. Rowlett, LP v. City of Rowlett*, No. 17-0850, 2018 WL 5919711 (Tex. argued Oct. 31, 2018), available at http://search.txcourts.gov/Case.aspx?cn=17-0850&coa=cossup.

Although KMS posits that this taking was not for a public use, its real argument is that the city's alleged ulterior motives undermine an otherwise facially valid public use. To the extent KMS implores us to consider *Phillips v. Naumann*, *Maher v. Lasater*, and *Estate of Waggoner v. Gleghorn*[3]—all cases standing for the principle that no public use is achieved when land is taken solely to benefit a private entity—it is against the backdrop of the economic-incentives deal and alleged collusion between the city and Briarwood/Sprouts. In other words, this case is potentially analogous to *Phillips*, *Maher*, and *Gleghorn* only if the city's reasons for taking KMS's land were pretexts for an impermissible, ulterior motive. But consideration of an ulterior motive—whether the city acted fraudulently by, for example, stating a facially valid public use for an otherwise impermissible taking—is an inquiry we address separately.

KMS also argues that this taking was not *necessary* to serve a public use. *See Whittington*, 384 S.W.3d at 772 (explaining that in addition to the constitutional public-use requirement, Local Government Code section 251.001 requires that a condemnation be "necessary to advance or achieve that public use"). KMS points out that Briarwood had "at least four driveway cuts to two major thoroughfares" without access to Kenwood Drive via cross-access over the KMS tract. KMS likens this case to *Phillips*, in which this Court held it was unnecessary to convert a private road across a ranch to a public road solely to provide an adjoining landowner access to his property when that landowner admitted he had other means of access. *See Phillips*, 275 S.W.2d at 467. In *Phillips*, however, the taking was premised on the representation that it was "absolutely necessary" for the landowner "to continue his residence and livelihood on said tract of land." *Id.* at 466. But the evidence showed otherwise. In this case, however, the ostensible reason for the city's

---

[3] 275 S.W.2d 464 (Tex. 1955); 354 S.W.2d 923 (Tex. 1962); 378 S.W.2d 47 (Tex. 1964).

condemnation was not to *create* access—it was primarily to *increase* it—as well as reduce traffic on nearby roads. KMS does not argue condemnation was unnecessary to serve those purposes. We have no reason to disagree with the court of appeals that the city's taking was, at least on its face, necessary for a public use.

## C

### *KMS did not raise a fact issue as to whether the taking was fraudulent*

We reiterated in *City of Austin v. Whittington* that "judicial review may nullify a taking where the condemnor's decision was fraudulent, in bad faith, or arbitrary and capricious." 384 S.W.3d at 777. KMS argues its summary-judgment evidence conclusively established all three, or at least raised a fact issue precluding summary judgment. The court of appeals considered the evidence for each category separately and concluded for each that KMS's evidence failed to raise a fact issue. 559 S.W.3d at 201–02.

We observe initially that although KMS states that the city's condemnation was fraudulent, in bad faith, and arbitrary and capricious, its actual argument sounds only in fraud. Although KMS articulates standards for all three categories, it argues in earnest only that the city's taking "is fraudulent because it is for private use under the guise of public use." KMS does not specify how its evidence would specifically support a bad-faith or arbitrary-and-capricious finding. But we have previously rejected the argument that "fraud, bad faith, and arbitrariness and capriciousness are simply means of proving that the City's stated use was actually private." *See Whittington*, 384 S.W.3d at 777. Because these categories are not interchangeable, we construe KMS's argument to be that the city's taking was fraudulent because it served as a pretext to confer a private benefit on Briarwood/Sprouts.

22

The court of appeals determined that "[f]raud in this context means 'any act, omission or concealment, which involved a breach of legal duty, trust or confidence, justly reposed and is injurious to another, or by which an undue and unconscientious advantage is taken of another.'" 559 S.W.3d at 201 (quoting *Malcomson Rd. Util. Dist. v. Newsom*, 171 S.W.3d 257, 269 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). It then concluded that "KMS does not provide any evidence that the City did any act or omission involving breach of a legal duty, trust, or confidence or which unduly or unconscionably took advantage of KMS other than make a determination of necessity and public use with which KMS disagrees." *Id.*

This traditional formulation of the elements of a fraud cause of action does not accurately reflect the standard applicable to takings cases. Rather, we have suggested that fraud in this context arises when "contrary to the ostensible public use, the taking would actually confer only a private benefit." *FKM P'ship, Ltd. v. Bd. of Regents of the Univ. of Houston Sys.*, 255 S.W.3d 619, 629 n.9 (Tex. 2008) (quoting *Whittington v. City of Austin*, 174 S.W.3d 889, 898 (Tex. App.—Austin 2005, pet. denied)). In *City of Austin v. Whittington*, we considered whether a taking was fraudulent under an agreed definition that was similar to the formulation from *FKM Partnership*: "the taking of property for private use under the guise of public use, even though there may be no fraudulent intent on the part of the condemnor." 384 S.W.3d at 779. KMS's argument that the city's facially valid public-use justification was merely a pretext to confer a private benefit on Briarwood and Sprouts sounds in either of these previously considered formulations.

Distilled to its essential points, KMS's fraud argument is that the city used its eminent-domain authority to acquire a right for Briarwood that Briarwood was unable to negotiate for itself. Upon learning it had no right to build the cross-access drive and failing to strike a deal to purchase

23

the requisite easement from KMS, Briarwood enlisted the city to condemn the easement. This is evident, KMS argues, from both email correspondence between Briarwood representatives and city officials discussing the lack of access and the decision by city staff to pull the economic-incentives agreement from city-council consideration for the stated reason that issues had arisen regarding Briarwood's ability to build the cross-access drive.

The city council later approved that agreement without any responsive modifications. But it later executed a letter amendment providing that the $225,000 payment to Briarwood in exchange for building the cross-access drive "may, however, be reduced in accordance with right-of-way acquisition costs incurred by the City (to include payments made to property owners, ROW acquisition agents, and direct costs incurred to acquire rights-of-way) to convert the existing private easement on the adjacent properties in the Luke's Landing subdivision/addition to a public street or roadway. Such reduction shall not exceed $62,750 without [Briarwood's] approval." This agreement plainly contemplates the city's condemnation of KMS's easement and provides that Briarwood would cover the city's costs out of its payment for building the cross-access drive.

KMS further points to Briarwood's lease with Sprouts as the motivation behind Briarwood's alleged push for condemnation and the city's willingness to oblige. The lease provides for reduced rent payments to Briarwood if Briarwood is unable to secure access across the KMS tract. Specifically, the lease states that the reduction will occur if, by a specified time, the city "has not taken all legal action required to approve the condemnation and taking of the real property upon which the Kenwood Drive Improvements are and will be situated." KMS contends that rent paid to Briarwood over the life of the lease would be reduced by $800,000 without the cross-access. Although the record contains no direct evidence that this lease provision motivated

24

the city's decision, the city's economic-development director acknowledged that "my understanding was that there was a provision within the Sprouts lease with a timing mechanism in there as far as when Sprouts wanted to have that access available for them."

It is important to be clear on what KMS is and is not arguing. Although KMS concedes the city's taking might be for a public use under different circumstances, KMS contends the city's ulterior motive—perhaps its only *actual* motive—was providing an economic benefit to Briarwood, Sprouts, or both, that would help seal the Sprouts deal. Some evidence shows, however, that the city considered condemnation long before Briarwood learned it would be unable to access the easement without the city's help.[4] Furthermore, there is no evidence showing the Sprouts deal would not have been consummated without the increased rental payment provided by the cross-access drive; indeed, the Sprouts store eventually opened without the drive.[5] In any event, although KMS insists cross-access was unnecessary to create access to the Briarwood tract and that no evidence shows a particularized need for traffic relief or emergency-vehicle access, KMS does not argue that these justifications are not in themselves public uses. KMS's argument is that the city's *real* reason for condemning its easement should negate a taking that otherwise unquestionably serves a public use.

---

[4] A PowerPoint presentation dated July 29, 2014, concerning the Sprouts project notes "potential need for condemnation for public roadway from Kenwood to new retail development . . . to be anchored by Sprouts Farmers Market." Evidence further suggests that the plat approved by the city for KMS's limited development of its tract required the drive to be extended if KMS sought to develop the tract further in the future. The extension of KMS's private drive to provide cross-access between tracts is provided for in every internal city memo, draft economic-incentives agreement, site schematic, and preliminary platting application appearing in the record.

[5] In an October 8, 2014, email rejecting KMS's offer to purchase the easement, Briarwood stated, "We have decided our best way forward on this situation is to convince our tenant to do this deal without the bridge and without direct access to Kenwood [D]rive" and that "whatever business they may lose by not having a secondary access point to Kenwood, they will make up in rent savings."

This is not, therefore, a case about a taking that was packaged as a public use but actually conferred only a private benefit. Here, KMS's argument that the economic-incentives agreement played a role in the taking does not negate any of the city's ostensible public uses justifying the taking. Rather, KMS's argument merely points to an additional, unstated private benefit the city arguably conferred on Briarwood, Sprouts, or both. So the question becomes whether the city's alleged desire to benefit a private entity negates a taking based on otherwise indisputably valid public uses. Put another way, is the taking fraudulent if the alleged private benefit does not negate the ostensible public use but simply suggests an additional motive behind the taking?

Under these facts, our answer is no. We have long held that a showing that a particular individual, group, or enterprise may benefit from a taking is insufficient to deprive the use of its public character. *See Higginbotham*, 143 S.W.2d at 84. Furthermore, a showing of fraud invalidates an otherwise valid taking only when "contrary to the ostensible public use, the taking would actually confer *only* a private benefit." *FKM P'ship*, 255 S.W.3d at 629 n.9 (internal quotations omitted) (emphasis added). The taking here plainly benefits the public at large even if it also privately benefits Briarwood and Sprouts. On the other hand, our cases invalidating takings that conferred only a private benefit turned on circumstances in which a single non-commercial landowner was benefitted by a condemnation that allowed access across an adjoining landowner's property to reach a public highway, or to more readily obtain access to the landowner's own property. *See Maher*, 354 S.W.2d at 923–24 (voiding a taking to establish a "public highway" that allowed a single landowner access to an existing highway and did "not serve as a means of access to any other land" and along which "[t]here are no other residents"); *Phillips*, 275 S.W.2d at 467 ("The undisputed evidence discloses that the only persons who could be benefited by the opening

26

of this road are [the respondents] and persons who might desire to visit them."). These cases, which implicated larger tracts of rural property, present a sharp contrast with a limited taking in a densely populated and heavily trafficked commercial area. The cross-access at issue in this case benefits Briarwood and Sprouts, but it also benefits other nearby businesses and an untold number of daily drivers who avail themselves of the retail businesses in the area. As Texas continues to urbanize, cities can reasonably be expected to take measures to increase access to popular businesses, ease congestion on existing roadways, and ensure first-responders can satisfactorily meet service demands.

We last considered a claim that a taking should be invalidated for fraud in *City of Austin v. Whittington*. In that case, the City of Austin forged a public-private partnership to facilitate construction of a new hotel near the city's convention center. 384 S.W.3d at 773–76. The city later condemned a downtown city block to build a public parking garage to serve the convention center, relieving the hotel developer of its obligation to provide parking for the convention center and saving it at least $10 million in construction costs. We rejected the argument that the taking was fraudulent because it "favored one private party over another at public expense" by "relieving [the hotel] of its obligation to provide parking" for the convention center. *Id.* at 779–80. Instead, we held that the parking garage's purpose—to provide parking for the expanded convention center— was a public use, and the city's decision to build its own garage and relieve the hotel of a contractual obligation to provide parking "was, at best, an incidental benefit" to the hotel. *Id.* at 780.

This case is similar. We acknowledge that, like the hotel in *Whittington*, Briarwood and Sprouts benefitted from the city's taking. Sprouts would conceivably get more customers through

an additional access point via Kenwood Drive, and Briarwood would receive rental payments from Sprouts undiminished by its failure to secure cross-access. But although the city's taking of KMS's easement can be construed as conferring these private benefits on Sprouts and Briarwood, neither benefit negates the public-use justifications for the taking. Even if the city knew Briarwood stood to lose money in rent without cross-access—and it is not clear that the city knew the specific terms of the lease, nor is there any evidence the city acted because of it—the rent adjustment is at best incidental to the public uses for which KMS's easement was condemned. And because there is no evidence that the Briarwood/Sprouts deal would not be consummated without cross-access— indeed, the lease provided for that contingency—no inference arises that the city had any motivation to ensure Briarwood would receive full rent payments.

It cannot be said that the cross-access benefit was incidental, of course, because increased traffic circulation between retail establishments was one of the city's justifications for the taking. But the city did not favor one private entity—Briarwood or Sprouts—over KMS by taking KMS's easement. Under these facts, cross-access benefitted both landowners equally. Although Sprouts would benefit from cross-access, no evidence suggests it would benefit any more than the several other businesses operating on the Briarwood and KMS tracts. In fact, the argument could be made that KMS in fact benefits more. Evidence suggests the plat-approval process KMS underwent when it developed its existing four commercial sites stipulated that KMS would have to extend the private drive if it later developed the rest of its tract. Instead, KMS got paid for its easement and avoided the costs of building the drive in the future.

Finally, we consider KMS's argument that the letter amendment is evidence of a quid pro quo between the city and Briarwood. Under this alleged arrangement, the city would acquire the

land Briarwood failed to attain but would take the costs out of what it agreed to pay Briarwood to build the cross-access drive. In our view, KMS's reading of the letter amendment amounts to no more than "mere surmise or suspicion" of collusion. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). If anything, the letter amendment shows the city was acting in its own interests. The city had already agreed to pay Briarwood $225,000 to build the cross-access drive. It renegotiated that deal to pay Briarwood less in light of its decision to condemn KMS's tract. As previously stated, there is no evidence the city was aware of the specific terms of the Sprouts lease or that it had any motive to help Briarwood secure higher rent payments. The lease provided for a deal even without cross-access, and no evidence suggests the deal was ever in jeopardy without it. At most, the letter amendment is evidence that the city acted to renegotiate an existing agreement to more favorable terms, and its use of a survey previously generated by Briarwood only further suggests it acted to save money. Nor will we read nefarious motives into the city's decision to allow private negotiations between KMS and Briarwood to play out before exercising eminent-domain authority. If the city had the authority all along to condemn KMS's easement for a public use, it did not act improperly in exercising its authority only as a last resort.

We conclude KMS failed to raise a fact issue precluding summary judgment on its claim that the taking should be invalidated on the grounds that it was fraudulent, in bad faith, or arbitrary and capricious.

## IV

### *Response to the dissent*

The dissent argues we should reconsider our case law on public use in light of a 2009 amendment to the Texas Constitution's Takings Clause, which "afforded property owners greater

protection against eminent domain in the wake of the United States Supreme Court's controversial decision in *Kelo v. City of New London*." *Post* at ___. In light of this amendment, the dissent contends we should "eliminate deference to the government in takings cases, undo [our] unjustified burden-shifting rule, and get rid of artificial restrictions on the defenses available to property owners." *Post* at ___.

We are not unsympathetic to this argument. The dissent aptly points out that the 2009 constitutional amendment meant to codify the positions Justices O'Connor and Thomas took when they dissented in *Kelo*. And we readily agree that constitutional text—especially when it has been amended since this Court developed its public-use jurisprudence—should rule over judge-invented interpretive rules. *See ETC Mktg., Ltd. v. Harris Cty. Appraisal Dist.*, 528 S.W.3d 70, 89 (Tex. 2017) (Brown, J., concurring) ("The text of the [c]onstitution, interpreted in light of its original meaning, should prevail over slavish devotion to judge-made, form-over-substance, multi-factor tests."). But we are reluctant to explore this potentially fertile ground here because, simply put, no one has asked us to. KMS argues chapter 2206 of the Government Code "was enacted to legislatively overturn *Kelo*." We have no doubt that chapter 2206 served to at least limit *Kelo*'s applicability in Texas, but even the dissenting justices agree that statute simply does not apply to the facts of *this* case. KMS goes on to argue that chapter 2206 "broadens the Texas constitutional prohibition against private use takings," and therefore "the Texas constitutional framework could be revisited." On this point we cannot agree. A statutory enactment cannot change the constitution's meaning. And we further decline to reconsider longstanding constitutional interpretation based on enactment of a statute we unanimously hold does not even apply to the taking at issue.

A change to the constitution itself, however, can prompt us to revisit prior decisions. But KMS never urges us to consider the impact of the 2009 constitutional amendment on our public-use jurisprudence. JUSTICE BLACKLOCK does so ably in dissent, and we would welcome the opportunity to further explore his position in a future case in which the issue is directly presented.

* * *

We affirm the court of appeals' judgment.

 

 

_____

Jeffrey V. Brown
Justice

OPINION DELIVERED: May 17, 2019

